In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2143

LACEY OGBOLUMANI and DAVID OGBOLUMANI,

*Plaintiffs-Appellants,*

*v.*

JANET A. NAPOLITANO, Secretary of the Department of
Homeland Security, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 6009—**Samuel Der-Yeghiayan,** *Judge.*

ARGUED DECEMBER 1, 2008—DECIDED FEBRUARY 20, 2009

Before BAUER, ROVNER, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* David and Lacey Ogbolumani
have been married for the past eight years and have
spent much of that time raising their young daughter,

Isabella. David[1] is not a citizen of the United States but Lacey is, so at first blush it would seem that David's immigration status is on the up-and-up. But David was married before, and the United States Citizenship and Immigration Services (USCIS), one of the predecessors of the now defunct INS, concluded after an extensive investigation that his first marriage was a sham that he entered into to evade immigration laws. Based on this conclusion, the visa petition Lacey filed on David's behalf was denied. David and Lacey appealed this denial to the BIA, with no success, and then turned to the district court. After dismissing their constitutional challenge to the denial, the court granted summary judgment in USCIS's favor. David and Lacey now appeal.

David, a citizen of Nigeria, entered the United States in 1990[2] when he crossed the Canadian border at Niagara Falls, New York, without inspection. Consequently, his first years here were as an undocumented immigrant. But his situation could have changed in 1997 when he

---

[1] David, his ex-wife Jamiler, and his current wife Lacey have all, at one time or another, shared the same last name. In order to avoid confusion, we will use their first names throughout this opinion.

[2] Ironically, 1990 was also the year that the movie *Green Card* hit the screen. The movie involved an INS investigation into the legitimacy of a marriage of convenience involving a husky French musician (Gerard Depardieu) seeking a green card and a beautiful American horticulturist (Andie MacDowell) seeking a greenhouse. The investigation in this case was not unlike the one that was undertaken in *Green Card*.

married Jamiler Cooper. Shortly after they married, Jamiler, who is a United States citizen, filed an I-130 visa petition on David's behalf to pave the way for his application for permanent residency. USCIS eventually called the couple in for an interview and told them to bring whatever documentary evidence they had to substantiate their marriage. But, according to the official who interviewed them, the documents they produced were inadequate, and a field investigation into the marriage was ordered to make sure that their union was legitimate.

The investigation took place 15 months later, and by then David's circumstances had changed drastically. His brief marriage to Jamiler had fallen apart—David claims that the two separated shortly after their interview with USCIS. During their separation David met and began dating Lacey, who, like Jamiler, was a United States citizen. Once his divorce to Jamiler was finalized, Lacey and David married, and three months later their daughter was born. That same month, USCIS began its investigation into David's first marriage.

That investigation uncovered evidence suggesting that David's first marriage was a fraud. Special agents for USCIS interviewed Jamiler's sister-in-law, who said that Jamiler received $5,000 to marry David and that the marriage was a "scam," while other relatives told the investigators that they knew nothing about the marriage. According to the human resources manager at David's place of employment, David claimed that he was single on his tax withholding statements and insurance forms, even while he was married to Jamiler. But the most damag-

ing evidence came from David and Jamiler themselves. Jamiler told investigators that David offered her money and that she accepted payment for her schooling as part of the marriage arrangement. When David was interviewed, investigators found him evasive and vague when it came to the circumstances of his purported cohabitation with Jamiler. Ultimately, when confronted with evidence that he had paid Jamiler to marry him, David said, "I felt I had no other way to obtain my immigration benefits. I did what I felt I had to do. You are intelligent investigators and basically have my head on a platter. However, I can't bring myself to 'mouth' the words that will destroy any remaining hope I may have." Based on this investigation, USCIS concluded that David's marriage to Jamiler was a sham. Jamiler, however, withdrew the petition before it could be denied.

Lacey then filed her own visa petition on David's behalf, but the previous investigation haunted the couple. In a written notice, USCIS informed Lacey that it intended to deny her petition because David had previously entered into a marriage for the purposes of evading immigration laws. *See* 8 U.S.C. § 1154(c). The agency went on to list several pieces of evidence uncovered during the investigation, including Jamiler's admission that David paid her tuition as a term of the marriage arrangement, the statement of Jamiler's sister-in-law confirming that the marriage was a scam, and David's incriminating statements. At the end of the notice, USCIS invited Lacey to respond to the allegations and submit any countervailing evidence.

Lacey, with the help of an attorney, submitted a response, arguing that David's first marriage was legitimate. She attached to the response two leases that David and Jamiler signed together, electric bills and car insurance cards in both of their names, and a letter from a bank certifying that they had opened a joint checking account. But USCIS found this response inadequate. After listing the evidence that Lacey submitted, USCIS explained that "[a]ll the submitted documents have been reviewed and taken into proper consideration," but that the evidence "failed to overcome the allegations listed in the Notice of Intent to Deny Petition for Alien Relative." Lacey appealed the decision to the BIA, adding two affidavits, one from herself and one from David. In his affidavit David did not deny making Jamiler's tuition payments or the accuracy of his incriminating statement, but he nonetheless asserted that he had been genuinely in love with Jamiler when they married. The BIA summarily affirmed USCIS's denial of the petition.

David and Lacey then turned to the federal courts. They filed a complaint against the USCIS alleging that the denial of Lacey's petition violated the Administrative Procedure Act, 5 U.S.C. § 706, and the Due Process Clause because it was arbitrary and based on unreliable evidence. USCIS filed a motion to dismiss the complaint, arguing that the district court lacked jurisdiction because the denial of the petition was a discretionary decision shielded from judicial review by the REAL ID Act of 2005, 8 U.S.C. § 1252(a)(2)(B)(ii). The district court disagreed, concluding that a statutory framework—not USCIS's discretion—governed how the petition had to be adjudi-

cated. But USCIS's motion to dismiss wasn't a complete bust. In it, USCIS also argued that David and Lacey failed to state a claim under the Due Process Clause, and the district court agreed, dismissing that claim. Both parties then filed competing motions for summary judgment. The district court concluded that USCIS had relied on substantial evidence when denying Lacey's I-130 petition and granted summary judgment in USCIS's favor. David and Lacey now appeal.

While USCIS does not resurrect its jurisdictional challenge here, we nonetheless begin by tackling this issue since it's our responsibility to ensure that a case falls within the scope of our review. *United States v. Lawrence*, 535 F.3d 631, 636 (7th Cir. 2008). The controversy here revolves around our inability to review a "decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this title to be in the discretion of the Attorney General or the Secretary of Homeland Security . . . ." 8 U.S.C. § 1252(a)(2)(B)(ii). The key to this jurisdictional bar is the statutory language that governs the decision being challenged. That statute must explicitly provide discretionary authority to immigration officials before we close the courthouse doors. *Soltane v. U.S. Dep't of Justice*, 381 F.3d 143, 146 (3d Cir. 2004).

The statutory basis for Lacey's petition is 8 U.S.C. § 1154(b), which states that an immigration officer "shall, if he determines that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is an immediate relative . . . approve the

petition . . . ." The statute goes on to state that "no petition shall be approved" if an alien has received (or tried to receive) immigration benefits through a sham marriage. *Id*. at § 1154(c). So, if an alien is an immediate relative (spouses of United States citizens are included in this group, 8 U.S.C. § 1151(b)(2)(A)(i)), the petition must be granted unless there is a history of fraud lurking in the background. We agree with the district court that this statute leaves no discretionary wiggle room; instead, the resolution of this type of petition is circumscribed by an explicit legal standard. *Ayanbadejo v. Chertoff*, 517 F.3d 273, 277-78 (5th Cir. 2008) (concluding that the court has jurisdiction to review denial of immediate relative petition); *compare El-Khader v. Monica*, 366 F.3d 562, 567 (7th Cir. 2004) (holding that court lacked jurisdiction to review revocation of visa because, under the statute, official "may, at any time, for what he deems to be good and sufficient cause" do so). Accordingly, we have jurisdiction to review this appeal.

On, then, to the heart of David and Lacey's appeal. The Ogbolumanis first argue that the denial of the petition was not supported by substantial evidence, in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2). They have a high hurdle to jump. It's not enough that we might have reached a different conclusion; so long as a reasonable mind could find adequate support for the decision, it must stand. *Ghaly v. INS*, 48 F.3d 1426, 1431 (7th Cir. 1995). Here, given the wealth of evidence uncovered during USCIS's investigation, that high hurdle is insurmountable.

David's own words wreak considerable havoc to his cause. Repeating what we just said, David told investigators, "I felt I had no other way to obtain my immigration benefits. I did what I felt I had to do. You are intelligent investigators and basically have my head on a platter." David does not take issue with the accuracy of the quotation but instead points out that the statement falls short of an outright confession of marriage fraud. But at this stage our task is not to mince words. USCIS acted reasonably by reading what was written between the lines and interpreting David's statement as an admission, in the face of mounting evidence, that he faked the marriage. In fact, its hard to imagine what else David could have meant when uttering those words. He attempts to render them innocuous by claiming that he wasn't responding to the allegations of fraud but, instead, explaining why he chose not to apply for a visa through his job. But even if David is right about the immediate context, it does him little good. In either case, David was talking about the way he actually tried to obtain a visa—his marriage to Jamiler—acknowledging both that he pursued the visa out of desperation and that the investigators had caught him red-handed.

What's more, David's admission was far from the only piece of evidence on which USCIS relied. For example, when interviewed, Jamiler admitted that David offered her money—and she accepted payment for her schooling—in exchange for the marriage. While paying a spouse's tuition is not necessarily an indicia of fraud, it becomes more than a bit fishy when the payout is used as an inducement for the marriage. Jamiler's sister-

in-law also confirmed that the marriage was a sham, although she described the terms of payment differently. Despite this inconsistency, both Jamiler and her sister-in-law acknowledged that the marriage was founded upon a quid pro quo—financial support in exchange for marriage—instead of a genuine desire to start a life together.

David and Lacey try to discount this evidence by pointing out that USCIS relied not on sworn statements by Jamiler and her sister-in-law, but summaries of what they had said, written by USCIS investigators. While sworn statements would have bolstered USCIS's case, they are not, as David and Lacey urge, required. Their dissatisfaction with the summaries is a hearsay objection of sorts—in essence they argue that, to ensure the reliability of such damaging evidence, the statements must come straight from the horse's mouth. But even in removal proceedings, hearsay is admissible so long as it's probative and its use is not fundamentally unfair. *Olowo v. Ashcroft*, 368 F.3d 692, 699 (7th Cir. 2004). Here, David and Lacey point to nothing that suggests that the summaries are inaccurate or unreliable beyond the general "inherent risks" that come with using a synopsis and suspicions, ungrounded in the record, that Jamiler lied out of spite for David. Such speculation is not enough to call into question the investigators' report. *See Doumbia v. Gonzales*, 472 F.3d 957, 963 (7th Cir. 2007).

David and Lacey also contend that the denial of the visa petition should be set aside as arbitrary and capricious because it inadequately explains why the evidence they provided was insufficient. *See* 5 U.S.C.

§ 706(a)(2)(A). The denial is light on reasoning, but it nonetheless provides an adequate explanation for the decision, and nothing more is required. After listing all the evidence that Lacey provided and emphasizing that "the submitted documents have been reviewed and taken into proper consideration," USCIS concluded that the evidence "failed to overcome the allegations listed in the Notice of Intent to Deny Petition for Alien Relative." Importantly, the documents that Lacey submitted left two key pieces of the USCIS's evidence unrebutted—the accuracy of David's all-but-confession and Jamiler's receipt of compensation, in the form of tuition payments, to marry David. USCIS could have fleshed out why it found each piece of the Ogbolumanis's evidence unpersuasive, but we have never required the agency to "write an exegesis on every contention" raised. *Rashiah v. Ashcroft*, 388 F.3d 1126, 1130 (7th Cir. 2004) (citations omitted). Instead, USCIS need only "announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Id*. at 1130-31 (citations omitted); *see also Ghaly*, 48 F.3d at 1431 (noting that an agency's decision "need not be compelling, or even convincing, to be sufficient"). By providing the evidentiary and legal basis for its decision and considering the countervailing evidence provided by the Ogbolumanis, USCIS has fulfilled its obligation here.

Next, the Ogbolumanis argue that the denial of Lacey's petition is arbitrary and capricious because USCIS departed from two of its regulations when adjudicating it. The first regulation prohibits the agency from con-

sidering evidence outside of an alien's file when adjudicating a visa petition. 8 C.F.R. § 204.2(a)(1)(ii). But our review of the record reveals that David's file was missing no evidence. The Ogbolumanis point out that USCIS accused David of claiming that he was single on his tax withholding statements and insurance forms but that neither of those forms were part of the record. But the investigators got this information over the phone from the human resources manager at David's place of employment, and a summary of that phone call is part of David's file. The absence of the forms themselves, which were never relied upon, is immaterial.

The second regulation that the Ogbolumanis claim was ignored requires USCIS to give them an opportunity to rebut the derogatory information it uncovered. 8 C.F.R. § 103.2(b)(16)(i). This argument misses the mark, and by a lot. Lacey received a notice explaining that USCIS intended to deny the petition, listing the evidence uncovered by the investigation into David's first marriage, and providing her with an opportunity, which she took, to respond. David and Lacey complain that the notice did not exhaustively list all the evidence USCIS found. For example, it omitted the names of Jamiler's relatives who told investigators that they knew nothing about her marriage to David. But the regulation does not require USCIS to provide, in painstaking detail, the evidence of fraud it finds. Not all the witnesses were identified by name, but the important ones were, including Jamiler's sister-in-law, who repeatedly told investigators that the marriage was a scam. What's more, Lacey and David didn't need the

names of the other relatives to rebut the evidence. They could have, but did not, submit statements from the members of Jamiler's family that supposedly knew about the marriage, including Jamiler's grandmother and aunt, whom David claimed in his affidavit to have met. Our review is deferential, and nit-picking the exact character-ization of the evidence would overstep our limited role.

Finally, the Ogbolumanis argue that the district court erred when it dismissed their due process challenge. In the complaint, the Ogbolumanis claimed that USCIS's "arbi-trary and capricious decision-making" amounted to a violation of their right to due process, essentially recasting their arguments under the Administrative Procedure Act as constitutional ones. But arbitrary rulings do not necessarily infringe upon the right to due process, *Subhan v. Ashcroft*, 383 F.3d 591, 595-596 (7th Cir. 2004), only "egregious administrative irregularities may amount to constitutional violations." *Sokolov v. Gonzales*, 442 F.3d 566, 569 (7th Cir. 2006). If anything, the information in the complaint undermines the Ogbolumanis' constitutional claim. The complaint in-cluded copies of the notice giving Lacey an opportunity to respond to the allegations of fraud and the denial of her petition, both of which demonstrate that USCIS followed its procedures, not that it radically departed from them. By doing nothing more than dressing up their claims under the Administrative Procedure Act as constitutional violations, the Ogbolumanis failed to state a claim. *See Limestone Dev. Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 802-03 (7th Cir. 2008) (holding that a com-plaint must contain "enough detail, factual or argumenta-tive, to indicate that the plaintiff has a substantial case").

We end by noting that throughout this whole process nobody has questioned the legitimacy of David and Lacey's marriage,[3] not even counsel for USCIS, Craig Oswald. We acknowledge that the denial of the I-130 petition will undoubtedly upend the lives of David, Lacey, and their now eight-year-old daughter. Although we are mindful of the profound disruption that this family faces, we are constrained to affirm the district court's decision. However, we encourage Mr. Oswald and the government to take a fresh look at David—who by all accounts has been a loving father, a financial support for his family, and, except for the mistake with Jamiler, a law-abiding resident of the United States for the past 18 years—and consider all its options before seeking his deportation. If there is some way David's grave error in judgment in connection with Jamiler can be forgiven (even the movie *Green Card*—see our footnote on page 2—involved true love), we urge the government to consider doing so.

The judgment of the district court is AFFIRMED.

---

[3] They are obviously in love, just like the two characters in *Green Card* (see our footnote 2) turned out to be.