In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1512

ANTONINA SURGANOVA,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A078-854-919

ARGUED OCTOBER 6, 2009—DECIDED JULY 20, 2010

Before BAUER, WOOD, and WILLIAMS, *Circuit Judges*.

WOOD, *Circuit Judge*. Beginning in the late 1990's, an unlikely cast of characters assembled in Northwest Chicago and played out a tumultuous drama, which culminated in the Department of Homeland Security's initiation of removal proceedings against Antonina Surganova in 2004. Surganova, a 58-year-old Lithuanian native and Ukrainian citizen, had succeeded in changing

her immigration status to that of a lawful permanent resident upon her marriage to Joseph Beaudion, a U.S. citizen, in April 2001. But, the government learned, things were not as they seemed. Working on a tip from Surganova's former son-in-law, Department of Homeland Security ("DHS") charged Surganova with removability on the ground that she had procured the adjustment in her immigration status through marriage fraud. See 8 U.S.C. §§ 1182(a)(6)(C)(I) and 1277(a)(1)(A).

After a full hearing, the Immigration Judge ("IJ") denied Surganova's motion to terminate the proceedings and concluded that she was removable because her marriage was a sham. On January 31, 2009, the Board of Immigration Appeals ("BIA") affirmed the IJ's decision. Surganova now petitions for review of the BIA's decision. Bearing in mind the deferential standard of review that applies here, we see no error in the BIA's conclusions. Nor do we find support for Surganova's assertion that her statutory and constitutional rights were violated during the removal proceedings. We therefore deny her petition.

**I**

Surganova traveled to the United States in 1997 to see her daughter Tatiana. During this visit, she met Beaudion and his roommate, Dr. Patrick Russo, who were neighbors of Tatiana and her husband Andrew Fleming. Surganova and Beaudion enjoyed each other's company and spent a great deal of time together. Although Surganova had to return to Ukraine, she came back to the United States in April 2000 on a visitor's visa to witness the birth of her

granddaughter, Emily. Over the course of the next year, Surganova and Beaudion reestablished their relationship. (We are not concerned with the legality, or lack thereof, of this portion of her stay here.) Some time around April 9, 2001, Surganova was divorced from her second husband, Volodimir Volodimirovich Surganov. Two days later, Surganova and Beaudion announced their engagement to their family and friends at an Easter brunch; they married two weeks later in a simple civil ceremony. In November 2003, Surganova had her immigration status adjusted based upon her marriage to Beaudion.

The marriage had little effect on Surganova's living arrangements. She and Beaudion continued living in separate apartments. Surganova lived in a basement room in the apartment she shared with her daughter's family, while Beaudion and Russo, who had been roommates since 1992, resided in a nearby condo that Russo owned. Beaudion spent between two to four nights a week at Surganova's apartment.

Things went smoothly until Tatiana and Fleming went through a nasty divorce in the summer of 2004. Tatiana and Fleming traded allegations of adultery and abuse, and then, escalating the stakes, Fleming evicted Tatiana and Surganova from the apartment, wrote to DHS, and asserted that Surganova's marriage was a sham. On August 6, 2004, three Immigration and Customs Enforcement ("ICE") agents went to Russo's house to interview Beaudion. During the course of the interview, Beaudion signed a sworn statement admitting that he

had agreed to marry Surganova only so that she could stay in the United States. Soon thereafter, DHS initiated removal proceedings against Surganova.

Before the IJ, Surganova presented a large number of witnesses who all testified that they believed that she had entered into her marriage with Beaudion in good faith. Beaudion tried to retract his damaging statement, testifying that he had been under duress during his interview with the ICE agents. The IJ found Beaudion's first story more convincing, especially in light of the ICE agents' testimony that Beaudion appeared calm and composed during the interview. In concluding that Surganova entered into a sham marriage, the IJ placed significant weight on Beaudion's sworn statement and the fact that the couple had never lived together.

The BIA found ample support in the record for the IJ's conclusions and affirmed his decision. It rejected Surganova's contention that the IJ had erred in denying her request to obtain additional evidence from the ICE agents. In response to Surganova's argument that her counsel was ineffective, the BIA pointed out that she failed to follow the well-established procedural requirements for raising this type of claim. Even if this procedural misstep were excused, Surganova's claim still lacked merit, the BIA concluded, because she attacked her attorney only for making reasonable tactical decisions. Surganova then filed this timely petition for review, in which she challenges all of those rulings.

**II**

This court reviews questions of law *de novo*. See *Sosebee v. Astrue*, 494 F.3d 583, 589 (7th Cir. 2007). In reviewing the BIA's conclusion that Surganova's marriage was fraudulent, we ask only whether the decision is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Sina v. Gonzales*, 476 F.3d 459, 461 (7th Cir. 2007). This court "will reverse only if the evidence compels a contrary conclusion." *Youkhana v. Gonzales*, 460 F.3d 927, 931 (7th Cir. 2006) (citations omitted). Since the BIA's opinion adopts and supplements the IJ's opinion, we review both. See *Patel v. Holder*, 581 F.3d 631, 634 (7th Cir. 2009).

To show that Surganova was removable under 8 U.S.C. § 1227(a)(1)(A), the government had to prove by clear and convincing evidence that Surganova procured an adjustment in her immigration status through marriage fraud, in violation of 8 U.S.C. § 1182(a)(6)(C)(I). See *Woodby v. INS*, 385 U.S. 276, 285-86 (1966); *Cordoba-Chaves v. INS*, 946 F.2d 1244, 1249 (7th Cir. 1991). In order to meet this burden, the government must demonstrate that the couple never intended to establish a life together. See *King v. Holder*, 570 F.3d 785, 788 (6th Cir. 2009); *cf. Aioub v. Mukasey*, 540 F.3d 609, 612 (7th Cir. 2008). When assessing the couple's intent, courts look to both the period before and after the marriage. See *Nikrodhanondha v. Reno*, 202 F.3d 922, 925 (7th Cir. 2000). The inquiry involves deeply personal questions, including those that probe the couple's courtship, their shared experiences, their living arrangements after marriage, and the degree

to which they share assets and liabilities. See *id.*; *Aioub*, 540 F.3d at 612.

According to Surganova, the IJ improperly concluded that Surganova's and Beaudion's separate living arrangements supported a finding of fraudulent marriage. In her view, the couple's decision to reside in separate apartments can easily be explained. Both Surganova and Beaudion testified that they could not afford to rent a new place after they got married. While Surganova's room was big enough for two people, Beaudion felt that he could not permanently leave his condo because he was serving as a caregiver for Russo. Beaudion also testified that he wanted to stay at his condo because Russo's background as a podiatrist was helpful in dealing with Beaudion's own recovery from quadruple bypass surgery. For her part, Surganova testified that she did not want to leave her apartment because she was helping take care of her granddaughter and did not think that Russo would allow her to move into his small apartment. Finally, Surganova argues that the judge failed to give proper weight to the evidence showing that Beaudion spent between two to four nights a week at Surganova's apartment.

Surganova's biggest problem is that the account she has presented bears more than one reasonable interpretation, and the IJ did not adopt the one that she prefers. The IJ found that the couple's limited cohabitation after marriage weighed against a conclusion that the marriage was *bona fide*. He was unpersuaded that the size of Surganova's bedroom precluded Beaudion from

moving in. The IJ did not separately address Beaudion's explanation for his continued stay at Russo's apartment, but this would be a problem only if that explanation compelled a different result. But it does not. While Beaudion initially helped Russo with his neuropathy when he moved in, Russo testified that he had given up on treatments for the condition. Russo said that Beaudion helped him by opening jars, doing laundry, and cooking. Nothing indicates that Beaudion would have been unable to assist with these tasks if he lived elsewhere, or that no one else could have filled in. Even if Russo helped Beaudion recover from his surgery, there were periods of time before and after the operation during which Russo's help may not have been necessary. Notably, Beaudion was apparently able to manage without Russo's assistance during the days and nights he spent with Surganova.

As the IJ pointed out, Surganova did not help herself either when it emerged that she had lied about living at Russo's apartment on a form she gave to DHS. Surganova counters that she provided this address only because she was having difficulty receiving mail at her apartment, but once again, the IJ was not required to accept that explanation. He was entitled instead to hold against her the fact that she did not give the agency her established address with her daughter.

We realize that in today's world husbands and wives may live in separate locations, but in this case Surganova and Beaudion provided explanations for their decision to live apart that the IJ found hard to believe. Nothing in

the record indicates that the IJ was using an inflexible rule under which a marriage could never be *bona fide* without cohabitation. All he did was permissibly weigh the couple's living arrangement as one of several factors supporting his ultimate conclusion.

Another damaging piece of evidence was Beaudion's sworn statement at the time of the initial investigation admitting that the marriage was a sham. As we noted, he attempted to recant at the hearing. Surganova has devoted considerable space in her argument to the details that support Beaudion's alleged duress while the ICE agents interviewed him. She points to the early hour of the day (between 7:00 and 9:00 a.m.), his inexperience with government officials, his fear of going to jail, his delicate medical condition, and the fact that when the agents arrived he had not yet taken his medications. Russo corroborated Beaudion's assertion that he was feeling ill and agitated during the interview.

However Surganova tries to dress it up, this is nothing more than an attack on the IJ's credibility finding. Surganova offers no reason why the IJ erred by crediting the testimony of ICE Agents Boris Baburich and Frank Romeo, who were the ones talking with Beaudion that morning, over Beaudion's later account. The minor inconsistencies she points out between the agents' account and Russo's testimony about details like their exact time of arrival, who owned the condo, and which high school Russo attended do not carry the day for her. Agent Baburich testified that although Beaudion was agitated and concerned when initially confronted, he appeared

calm and collected during most of the interview. Neither agent noticed that Beaudion was under any significant amount of stress or suffering from a medical ailment.

Lastly, Surganova devotes a great deal of time to an effort to undermine the testimony of the disgruntled ex-son-in-law, Andrew Fleming. Initially, Fleming was helping Surganova in her effort to stay in the United States. On November 18, 2003, he submitted a Form I-864 with an affidavit to DHS as a co-sponsor for Surganova's petition to change her immigration status based on her marriage to Beaudion. In his submission, Fleming swore that Surganova's current address was Beaudion's condominium on North Clinton street. Yet a mere seven months later, Fleming changed his tune when he sent a letter and affidavit to DHS alleging that their marriage was a fraud. Contrary to his representation in the Form I-864, Fleming told DHS that Surganova had never resided with Beaudion, which was what caused Fleming to form the impression that the marriage was a sham.

To reconcile these seemingly conflicting affidavits, Fleming testified that he did not have any reason to question the validity of Surganova's marriage at the time he filed the Form I-864. Although this has little bearing on the ultimate outcome of Surganova's petition, we find Fleming's story hard to believe. The proof of Surganova's fraudulent marriage that Fleming provided in 2004—Surganova's and Beaudion's separate residences—was apparent to him at all times, because Surganova was living in Fleming's apartment for every

minute of the relevant period. It is more likely that the true reason behind Fleming's sudden change of heart was related to his divorce from Tatiana. Fleming reported Surganova to DHS only a month after he evicted Tatiana and Surganova from his apartment. He testified that Surganova was "very much involved in the failure of [his] marriage." As further evidence of the bad blood between the two, he later obtained protective orders against Surganova and filed suit against her for infliction of emotional distress. But the question remains, when was Fleming telling the truth: back in 2003, when his marriage was intact and he was helping his mother-in-law, or in 2004, after he had turned angry and bitter? It is difficult to see how both affidavits can be true, although we do not rule it out, as this issue is not before us. But if Fleming in fact knowingly submitted a false affidavit, the wrongdoing would be particularly egregious given that he is a licensed attorney in Illinois.

### III

Besides contesting the IJ's final order of removal, Surganova contends that two additional rulings deprived her of the fair proceeding to which she is entitled under the statute: first, the IJ's denial of her renewed "Motion for Issuance of Subpoenas for Officers' Materials & to Recall Officers as Witnesses," and second, his denial of her motion for a new trial based upon ineffective assistance of counsel. We are authorized to review her contention that the denial of these motions violated her

rights under the Fifth Amendment; to the extent that she is complaining about the IJ's failure to follow procedures spelled out in regulations, we review his decisions for abuse of discretion. See *Kucana v. Holder*, 130 S. Ct. 827 (2010).

Surganova first complains that the IJ violated her statutory right to present evidence in support of her case when he denied her motion to introduce additional evidence. See 8 U.S.C. § 1229a(b)(4)(B). In line with the plain language of the statute, this court has held that a petitioner must be given "a reasonable opportunity . . . to present evidence on [her] own behalf." *Rehman v. Gonzales*, 441 F.3d 506, 509 (7th Cir. 2006) (quoting 8 U.S.C. § 1229a(b)(4)(B)). Whether the IJ complied with this statutory mandate is a question of law. See, *e.g.*, *Figueras v. Holder*, 574 F.3d 434, 437 (7th Cir. 2009); *Rapheal v. Mukasey*, 533 F.3d 521, 532 (7th Cir. 2008).

Though Surganova has a statutory right to present evidence to the IJ (and we have no reason to think that this statutory right gives less than the Fifth Amendment's due process clause would demand), she can prevail only if she can demonstrate that the IJ's decision to exclude evidence caused her prejudice. See *Alimi v. Gonzales*, 489 F.3d 829, 837 (7th Cir. 2007); *Zamora-Mallari v. Mukasey*, 514 F.3d 679, 696 (7th Cir. 2008). She might do so, for example, by showing that the IJ barred "complete chunks of oral testimony that would support [her] claims," or "curtailed [her] testimony on matters that go to the heart of the claim," or "where evidence excluded by the IJ 'had the potential for affecting the outcome of

the proceedings.'" *Lopez-Monterroso v. Gonzales*, 236 F. App'x 207, 212 (7th Cir. 2007) (collecting cases); see also *Chavez-Vasquez v. Mukasey*, 548 F.3d 1115, 1118 (7th Cir. 2008).

This is a standard that Surganova has not met. She wanted, through her renewed motion, to obtain the ICE agents' I-213 investigative report and their notes detailing the August 2004 interview with Beaudion. She also wanted to call ICE Agents Baburich and Romeo back to the stand to testify. The IJ saw this as an attempt by Surganova's newly appointed counsel to change strategy midway through the proceedings. Prior counsel, in the judge's view, had already conducted a full and adequate cross-examination of the government's witnesses. In addition, the judge concluded, the evidence was largely peripheral. Surganova wanted to use the I-213 investigative report to show that it did not record the time the agents arrived at Russo's condo. But nothing turned on this; the earliest possible time, 7:00 a.m., would not have been unreasonably early. Surganova also speculated that the I-213 and the agents' notes might have been inconsistent with their testimony, but this is wishful thinking. Even if Surganova could show that the agents' recollections were at times imperfect, it is unlikely that this would have called into question the validity of Beaudion's sworn statement. In short, the IJ's ruling on this point was an acceptable exercise of his authority to manage the hearing.

Surganova's ineffective assistance of counsel contention fails for similar reasons. Although aliens do not possess a

Sixth Amendment right to counsel, we have recognized that the denial of effective assistance of counsel may under certain circumstances violate the due process guarantee of the Fifth Amendment. See *Jezierski v. Mukasey*, 543 F.3d 886, 888 (7th Cir. 2008) (citing *Kay v. Ashcroft*, 387 F.3d 664, 676-77 (7th Cir. 2004)). But see *Patel v. Gonzales*, 496 F.3d 829, 831 (7th Cir. 2007) ("[A]liens do not have a constitutional right to effective counsel."). In *Kay*, we expressed grave doubts about the attorney's performance, since he had mislabeled motions and ignored a "wealth of corroborative evidence in the record." *Kay*, 387 F.3d at 676.

In addition to the constitutional claim, Surganova also asserts that the IJ misapplied the procedural requirements for an ineffective assistance claim when it denied her motion for a new trial. The problem for Surganova is that the BIA hedged in its opinion, explaining that even if Surganova had complied with the requirements set forth in *Matter of Lozada*, 19 I&N Dec. 637, 639 (BIA 1988), her claim would still fail because she had not shown that her counsel's actions had prejudiced her case. We note that the legal standards that the BIA wishes to follow for these claims has been in a state of flux. In early 2009, the Board abrogated *Lozada,* in *Matter of Compean,* 24 I&N Dec. 710 (BIA 2009). Later that year, the Attorney General withdrew the *Compean* decision, 25 I&N Dec. 1 (AG 2009), and ordered the Executive Office of Immigration Review to go back to the *Lozada* standards pending a comprehensive review of the rules in this area. To our knowledge, that review is still ongoing. Even if it ends up as favorably as possible for petitioners

like Surganova, however, it would still be necessary for them to demonstrate prejudice resulting from the attorney's substandard performance. (Indeed, prejudice is a critical element even for cases involving the Sixth Amendment right to effective assistance of counsel. See *Strickland v. Washington,* 466 U.S. 668 (1984).)

Surganova asserts only that her lawyer was ineffective because the lawyer should have obtained the I-213 investigative report and should have objected to the ICE agents' testifying from their memory of the relevant events. We have already explained why it is unlikely that either the report or the challenge to the testimony would have made a difference. This is enough to put to rest Surganova's complaint about the effectiveness of the legal assistance she received.

* * *

We DENY Surganova's petition for review.