In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2334

ANKUSH SEHGAL and MOHIT SEHGAL,

*Plaintiffs-Appellants*,

*v.*

LORETTA E. LYNCH,
Attorney General of the United States, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 8576 — **John Robert Blakey**, *Judge*.

ARGUED DECEMBER 15, 2015 — DECIDED FEBRUARY 22, 2016

Before BAUER, POSNER, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This appeal arises from an unusual immigration case that was filed properly in the district court. Plaintiffs Mohit and Ankush Seghal filed an "I-130" petition seeking lawful permanent resident status for Mohit, who is a citizen of India, as the husband of Ankush, who is a citizen of the United States. Immigration authorities denied their petition on the ground that Mohit had tried years earlier

to gain lawful residence in the United States by a fraudulent marriage to another woman. That made him ineligible for relief even though his marriage to Ankush is legitimate. See 8 U.S.C. § 1154(c).

The decision to grant or deny an I-130 petition is not a matter of agency discretion, and Mohit is not subject to a removal order. The proper means to challenge the denial is therefore a suit in the district court under the Administrative Procedure Act, 5 U.S.C. §§ 702 & 703. See *Ogbolumani v. Napolitano*, 557 F.3d 729, 733 (7th Cir. 2009); *Ruiz v. Mukasey*, 552 F.3d 269, 274-76 (7th Cir. 2009). The Seghals sued under the APA.

The district court found that substantial evidence supported the agency's finding of marriage fraud and thus granted summary judgment against the Seghals. We affirm. Although the agency's handling of this case has involved procedural errors that are difficult to understand, the bottom-line decision was legally sound. Substantial evidence, including Mohit's own written admission, supports the agency's finding that Mohit's earlier marriage was fraudulent, so the denial of Ankush's I-130 petition on his behalf was correct.

We begin with the story of Mohit's earlier marriage to Renee Miller. Mohit Sehgal entered the United States lawfully on a visitor's visa in September 2000 but overstayed his visa. Three years later, in June 2003, he married Renee Miller, a United States citizen. She then submitted on Mohit's behalf a Form I-130, called a Petition for Alien Relative, to have him recognized as an immediate relative for immigration purposes. See 8 U.S.C. §§ 1151(b)(2)(A)(i), 1154(a)(1)(A)(i); 8 C.F.R. § 204.1(a)(1). At the same time, Mohit filed a Form I-485 application to adjust his status to lawful permanent resident

based on his claimed family relationship to U.S. citizen Miller. See 8 U.S.C. § 1255(a).

Immigration authorities investigated the marriage between Mohit and Miller and concluded that it was not a good faith marriage. During a 2005 interview concerning Miller's I-130 petition, Mohit and Miller asserted that they lived together at the home of Mohit's mother. An immigration agent had telephoned Mohit's mother in March 2005 and was told that she had "no idea" where to find Miller and had no means of contacting her. Based on that conversation and the lack of evidence of a "joint marital union," Miller's petition was denied in November 2005 by United States Citizenship and Immigration Services ("USCIS").

Miller responded by submitting additional evidence to bolster the claim of a legitimate marriage. She included bank statements from a joint account, rent receipts purportedly from Mohit's mother, and two sworn statements in the mother's name saying that Miller and Mohit had lived with her since June 2003. Almost a year after receiving those documents, in December 2006, USCIS reopened the proceedings on Miller's I-130 petition.

By then, however, the marriage between Miller and Mohit had ended. Miller gave birth in 2007, and USCIS received a letter apparently signed by Mohit admitting that he was not the child's father. Miller later obtained a court order of protection against Mohit. In July 2008, an Illinois court entered a default judgment dissolving the marriage. The judgment noted that the parties had separated around October 2003, just four months after they married. Afterward, in December 2008, Miller and Mohit both failed to appear for a scheduled interview with USCIS. In March 2011 the agency denied the reopened

I-130 petition on the ground that there no longer was a marital relationship.

In the meantime, in September 2009, agents working for Immigration and Customs Enforcement ("ICE") had arrested Mohit while investigating the woman who had prepared Miller's I-130 petition for brokering fraudulent marriages. Her name was Teresita Zarrabian, and she eventually pled guilty to conspiring to defraud the United States under 18 U.S.C. § 371. She was sentenced to three years in prison. *United States v. Zarrabian*, No. 13-cr-00106-1 (N.D. Ill. July 1, 2015).

Mohit gave the ICE agents a sworn confession admitting that he had paid Zarrabian and Miller for help in obtaining permanent residency by marrying Miller. Zarrabian had introduced him to Miller, he said, and arranged the marriage in exchange for $18,000 to be shared by the two women. Mohit's confession concluded by saying that his union with Miller "was not a real marriage" and was done so that he could obtain "permanent status" in the United States. Mohit initialed the three pages of text and swore that he had read each page of the confession and had given it "freely and voluntarily."

In March 2011, Miller gave ICE agents a written statement corroborating Mohit's earlier confession that their marriage had been a sham. That handwritten statement, which was not shared with Mohit until the district court proceedings, explained that Miller was promised $5,000 to marry him. The couple had intended to divorce, the statement continued, after Mohit received a "green card." Although the agent who faxed Miller's statement wrote on the transmittal page that it was sworn, no language in the statement itself shows that Miller had signed it under penalty of perjury.

Mohit's confession of the earlier marriage fraud and the corroborating 2011 statement by Miller suffice to support the finding of fraud. See *Ogbolumani v. Napolitano*, 557 F.3d 729, 733–34 (7th Cir. 2009) (concluding that USCIS did not err in basing denial of petition on admission of marriage fraud); *Aioub v. Mukasey*, 540 F.3d 609, 612 (7th Cir. 2008) (admissions that marriage was entered into in exchange for money and access to apartment and vehicle provided "substantial evidence" that marriage was fraudulent); *Ghaly v. INS*, 48 F.3d 1426, 1431 (7th Cir. 1995) (upholding denial of petition based on sworn statement admitting marriage fraud); *Matter of Isber*, 20 I. & N. Dec. 676, 679 (BIA 1993) (explaining that spouse's admission that she married alien as favor to help him obtain permanent residency shows that they "did not intend to establish a life together as husband and wife when they married"). Moreover, Mohit's story contains numerous inconsistencies, including the dates he allegedly lived with and separated from Miller. See *Reynoso v. Holder*, 711 F.3d 199, 207 (1st Cir. 2013) (explaining that record did not compel conclusion of bona fide marriage when oral and written statements were inconsistent).

On appeal, the Seghals attempt to undermine this evidence of marriage fraud by attacking both Miller's handwritten statement and Mohit's September 2009 sworn confession to ICE agents.

*Miller's Statement*: First, the Sehgals contend, Miller's statement should be disregarded as unreliable hearsay. Hearsay is admissible in immigration proceedings as long as it is probative and its use is not fundamentally unfair. See *Ogbolumani*, 557 F.3d at 734; *Olowo v. Ashcroft*, 368 F.3d 692, 699 (7th Cir. 2004).

Miller's handwritten statement details the scheme between Miller, Mohit Sehgal, and Zarragian to commit marriage fraud. It is highly probative as to whether Mohit entered into a marriage to gain an immigration benefit. And the Sehgals give no reason to question the statement's reliability other than the fact that it is unsworn. Their speculation about Miller's motive for writing the statement and the "chain of custody" is insufficient to undermine the evidence. See *Ogbolumani*, 557 F.3d at 734; *Doumbia v. Gonzales*, 472 F.3d 957, 962–63 (7th Cir. 2007).

But we also now know that USCIS and the Board did mischaracterize Miller's statement as "sworn." Twice in its brief to this court the government referred to Miller's statement as "sworn," despite the assertion in the Seghals' brief that it was not. The government's brief would not be cause for concern if it were accurate, but elsewhere in the same brief (and when pressed at oral argument) the author of the brief conceded that Miller's statement was not sworn.

It is difficult to understand how the government could take both positions. It seems from the record that the government was content to continue mischaracterizing Miller's statement as sworn until after a copy finally was shown to the Sehgals during the proceedings in the district court. The time to have set the record straight was immediately after USCIS mischaracterized Miller's statement as sworn, not more than four years later after that same mistake was made in submissions to the BIA, the district court, and now this court. The label matters. As the Sehgals correctly argue, Miller's statement may have been weighed more heavily than it should have been if it had been known to be unsworn. See *Yu Yun*

*Zhang v. Holder*, 702 F.3d 878, 881–82 (6th Cir. 2012) (recognizing that affidavits often are given more weight than unsworn statements); *Zuh v. Mukasey*, 547 F.3d 504, 509 (4th Cir. 2008) (same).

Still, although we are disappointed by the government's sloppiness, this error by USCIS and the Board was harmless. Miller's handwritten statement is corroborated in large part by Mohit's September 2009 confession. That confession was sworn and came from Mohit himself, and it was clearly an admission against interest. See 5 U.S.C. § 706 (instructing reviewing court to take "due account" of "rule of prejudicial error"); *People of the State of Ill. v. I.C.C.*, 722 F.2d 1341, 1348 (7th Cir. 1983) (recognizing harmless error as exception to *Chenery* doctrine). And given Mohit's confession, Miller's statement was not necessary to the finding of marriage fraud.

*Mohit Seghal's Confession*: We now turn to the Seghals' attack on Mohit's own confession of marriage fraud. Recall that Mohit had made that confession in writing in 2009 after he was arrested by ICE agents. Mohit was released without charges and four months later married Ankush, who filed a new I-130 petition on Mohit's behalf. The Seghals argue that Mohit's confession was coerced, is not reliable, and thus does not provide substantial evidence of fraud.

The exclusionary rule does not ordinarily apply in immigration proceedings. See *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1050 (1984); *Martinez-Camargo v. INS*, 282 F.3d 487, 492 (7th Cir. 2002). Suppression may be justified, however, if evidence was obtained under circumstances involving "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." *Lopez-Martinez*,

468 U.S. at 1050–51; see *Gutierrez-Berdin v. Holder*, 618 F.3d 647, 652 (7th Cir. 2010); Martinez-Camargo, 282 F.3d at 492; *Matter of Toro*, 17 I. & N. Dec. 340, 343 (1980).

An alien claiming coercion by government officials "must come forward with proof establishing a prima facie case before the Service will be called on to assume the burden of justifying the manner in which it obtained the evidence." *In re Burgos*, 15 I. & N. Dec. 278, 279 (BIA 1975); see *Luevano v. Holder*, 660 F.3d 1207, 1212 (10th Cir. 2011).

Mohit first asserted coercion on March 15, 2011, when he and Ankush were interviewed in connection with her I-130 petition. Mohit asserted that he had not been given a copy of the 2009 written confession. He claimed that while he was in ICE custody, he had been "handcuffed despite being in a cast," "almost tortured," and "kept in a dark room and then in a stinking bathroom in the dark." According to Mohit's new account, which again was sworn, he had married Miller with the "honest perception" that he "would live a life with her."

Days later the director of a USCIS field office issued a notice of intent to deny Ankush's I-130 petition on the ground that Mohit's marriage to Miller had been fraudulent. Although Mohit and Miller had submitted "significant evidence of marital union," the notice explained, that evidence was "impossible to reconcile" with the admissions of marriage fraud from both. The notice quoted in full Miller's handwritten statement (which the agency characterized as sworn). The notice also acknowledged but rejected Mohit's repudiation of his confession.

USCIS invited the Sehgals to submit additional evidence to prove that Mohit's marriage to Miller had been bona fide.

Mohit submitted an affidavit swearing that the marriage had been "real" and elaborating on his confession to the ICE agents. His admission of fraud, he attested, was given under duress:

> I was in the custody of immigration officials who were threatening me with all kinds of things. They had me sign a statement without letting me read it first. They told me I had to sign it. In addition, I was in an accident shortly before I was taken into custody, and was on medication and had my hand in a cast. Despite the fact that I told the immigration officers both of these facts, they still kept me handcuffed, on my casted hand, and made me sign a statement without reading it.

The affidavit said nothing about torture or being held in a dark "stinking bathroom," as Mohit had claimed during his March 2011 interview. Mohit submitted medical records showing that he had gone to a hospital emergency room complaining of pain from kidney stones five days before he was arrested and confessed. Also, Ankush submitted a letter offering her own assessment that Mohit would not commit fraud and had "genuine" intentions in marrying Miller.

Mohit's allegations of coercion are too vague and inconsistent to undermine his confession of fraud. See *Matter of Isber*, 20 I. & N. Dec. at 679 (explaining that spouse's "general claim of duress is insufficient to retract her detailed admissions as to the fraudulent nature of her marriage"). His two statements claiming coercion, made only weeks apart, were not even consistent with each other. In the first Mohit said he was "almost tortured," but in the second he asserted only that

he was handcuffed despite his arm being in a cast. Mohit did not say how agents threatened him or say what the agents said during his interview. The agents could have "threatened" to do something entirely lawful. See *Rajah v. Mukasey*, 544 F.3d 427, 445 (2d Cir. 2008) (explaining that "threat of criminal sanctions for willfully failing to provide required regulatory information does not make providing the information coercive").

Mohit submitted medical records showing he was in pain around the time of the interview. He has never disclosed what medication he was taking, nor did he submit an affidavit from his doctor or other medical evidence suggesting that the medication would have undermined the voluntariness of his confession. And Mohit's remaining assertions are not the kind of "egregious" actions calling for suppression of evidence. See *Gutierrez-Berdin*, 618 F.3d at 652–53 (explaining that "self-serving affidavit" alleging "very minor physical abuse coupled with aggressive questioning" did not warrant suppression); *Oliva-Ramos v. Attorney Gen. of U.S.*, 694 F.3d 259, 279 (3d Cir. 2012) (listing factors relevant to egregiousness inquiry, including whether agents resorted to unreasonable shows of force or physical abuse).

Accordingly, the Seghals have not shown sufficient reason to discount either Mohit's own confession of marriage fraud or Miller's written corroboration. They have not shown that the agency decision was made without substantial supporting evidence.

The Sehgals also raise procedural objections to the agency's decision. They argue that USCIS violated one of its own regulations by not providing them with a copy of Miller's handwritten letter during the administrative proceedings.

The regulation, 8 C.F.R. § 103.2(b)(16)(ii), prohibits the agency from basing a determination of statutory eligibility on information that has not been disclosed to the applicant or petitioner. We have stressed before that "the better procedure" is for agencies to "produce the statement in question," *Ghaly*, 48 F.3d at 1435, and we are puzzled by USCIS's continued failure to do so. See *id*. at 1437 (Posner, J., concurring) (describing refusal to provide statement as "inexplicable, offensive, and absurd, as well as contrary to the INS's regulations").

This point is especially relevant where, as in this case, the government has mischaracterized evidence with an error that would have been caught much earlier if the Sehgals had been allowed to see the evidence. But we also have recognized that a summary can suffice, see *id*. at 1434–35, and here USCIS provided more than the summary that we found in *Ghaly* was adequate. The notice USCIS sent to the couple repeated Miller's handwritten statement verbatim, though as noted it did not show that her statement was not sworn.

Finally, the Sehgals contend that the Board erroneously ignored "egregious conduct" by USCIS. The agency had told the Sehgals that it forwarded their appeal to the Board when in fact it had not done so (and did not do so for another year after making that representation). This error and delay were also unfortunate, yet the Sehgals do not identify any regulation that USCIS violated, nor do they say how they were harmed by the agency's error. Delay alone, we have explained, "does not constitute 'affirmative misconduct' on the part of the government." *Mudric v. Attorney Gen. of U.S.*, 469 F.3d 94, 99 (3d Cir. 2006); see *INS v. Miranda*, 459 U.S. 14, 19 (1982) (explaining that government's failure to process application promptly "falls far short" of affirmative misconduct);

see also Rajah, 544 F.3d at 445 (characterizing "[i]mpoliteness and slow service" as "unfortunate, but not uncommon, characteristics of many ordinary interactions with government agencies").

To conclude, the agency had substantial evidence, in the form of Muhit Sehgal's and Miller's written confessions to marriage fraud, as well as the inconsistencies found in the original investigation of their marriage, to support the finding that Muhit had engaged in marriage fraud. He is therefore ineligible for relief under the I-130 petition that Ankush filed on his behalf. The judgment of the district court is

AFFIRMED.