**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 25, 2018
Decided July 26, 2018

**Before**

DANIEL A. MANION, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

No. 17-2492

| | |
|---|---|
| CHRISTOPHER FLIGER and ANNA FLIGER, <br>     *Plaintiffs-Appellants*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 15-CV-5704 |
| KIRSTJEN M. NIELSEN, Secretary of Homeland Security, et al., <br>     *Defendants-Appellees*. | **Jorge L. Alonso**, <br> *Judge*. |

**O R D E R**

Christopher and Anna Fliger appeal the denial of an I-130 visa petition that Christopher filed, as a U.S. citizen, on Anna's behalf asking the United States Citizenship and Immigration Services (USCIS) to adjust Anna's immigration status based on their marriage. There is no question that Christopher and Anna's marriage is legitimate, but immigration authorities denied the petition based on Anna's attempt to gain permanent-resident status in the United States through an earlier fraudulent marriage. Once a person has entered into a marriage to evade immigration laws, he or she is ineligible for relief any time in the future. See 8 U.S.C. § 1154(c). Christopher and Anna sought judicial review of the decision under the Administrative Procedure Act,

5 U.S.C. §§ 701–06. The district judge entered summary judgment against them. We affirm the district court's judgment because substantial evidence supports the decision that Anna and her previous husband entered into marriage primarily to evade immigration laws.

## Background

Anna, a citizen of Poland, married Fred Kirschnick in 1995 when she was 18 years old and he was 71. She had arrived in the United States in 1991 on a visa and then "overstayed." At the time of the marriage, Anna had neither been in immigration proceedings nor had any prior contact with immigration authorities. The following year, Fred filed a visa petition seeking to classify Anna as his spouse, and Anna applied for an adjustment of status. For reasons the record does not disclose, Fred and Anna did not receive an interview until approximately 11 years after filing their paperwork. At oral argument, counsel for the agency agreed that 11 years was an unusually long delay. By the time the interview took place in August 2007, Fred was 82 years old, resided in a nursing home, experienced problems with his eyesight, and had suffered a stroke.

Fred and Anna's petition went awry when they told different stories of their courtship in their interviews. See *Nikrodhanondha v. Reno*, 202 F.3d 922 (7th Cir. 2000) (inconsistent statements made by couple may be basis for denial). Anna said that she met Fred in 1991 when her sister was cleaning his house. She had dinner with him and they began dating. Anna admitted that they did not live together immediately after getting married, but she said that they had lived together for one year in 1999. That ended when Fred encountered financial trouble. Then the couple became homeless until Fred moved into a nursing home, and Anna moved in with her sister. She said they saw each other about six times a month, as much as possible because of the distance between their homes.

At the outset of his interview Fred acknowledged that he was answering questions "freely and voluntarily." He described meeting Anna through her sister, who had been his housecleaner until she became pregnant, at which point Anna took over the cleaning. When asked whose idea was it to file the petition, Fred responded that Anna had suggested it. He said: "I found her crying while cleaning my house. She told me she was going to be deported and I asked if there was anything I could do to help her. She told me to marry her so she could stay here. We never lived together."

When asked if Fred felt that Anna was using him for an immigration benefit or money, Fred responded, "No, I never felt that way. In fact, I feel like I have taken advantage of her because she is such a good looking girl. We have made love many

times." When asked about the time they spent together, Fred told the interviewer that they saw each other about six times a month and that they had gone out to eat twice the week of the interview. They spent holidays together. He said they had a joint bank account, albeit one opened only three years before the interview, and that before that he had signed blank checks for Anna.

At the end of the interview, Fred signed a form withdrawing the I-130 petition. The typed statement read:

> I met Anna through her sister. Her sister was a housecleaner for me. Anna took over her sister's housecleaning. While she was working for me, Anna asked me to marry her so she wouldn't be deported and so she could get an immigration benefit. I never lived with Anna Pienkowski nor do I live with her right now.

The form was signed by Fred, witnessed by another person, and signed by the immigration official conducting the interview.

The withdrawal of the I-130 petition triggered an automatic denial of Anna's application to adjust her status. A month later Fred and Anna filed a motion to reopen and reconsider the application. They included an "affidavit" that was signed (but not dated or notarized, or executed under the penalty of perjury) by Fred and explained that he had ongoing medical issues and, at the time of the interview, was preparing for cataract surgery. He said that he had been using medication that interfered with his vision and was unable to see the documents that he signed. He also said that he had been confused and unable to understand all the questions. Fred further stated that he and Anna had a good marriage despite their age difference, that he had resided with her until he moved to a nursing home, and that he had never intended to withdraw the petition.

The USCIS denied the motion to reopen because once a petitioner withdraws an application it cannot be revived. See 8 C.F.R. § 103.2(b)(6). The agency also denied the motion because "Anna's arguments were to be 'given little weight because no factual evidence was submitted to support them.'" Anna was then placed into removal proceedings in February 2010. Fred died the following month. Anna was the sole beneficiary of his estate, and she made all the funeral arrangements. Anna started dating her current husband, Christopher, one month after Fred's death, and they married the following January.

Christopher filed an I-130 petition on Anna's behalf in March 2011. After interviewing the couple, the USCIS sent a notice of its intent to deny the petition

because of her previous fraudulent marriage. The notice included a quotation from Fred's signed withdrawal statement but did not provide a copy of the statement. Christopher and Anna submitted additional evidence, including a medical record from around the time of Fred's cataract surgery stating without elaboration that he had dementia, and records of regular phone calls between Fred and Anna. But the USCIS nevertheless denied their petition.

The USCIS decision listed the evidence that had been considered and acknowledged that the documents and evidence showed the development of a long-term relationship between Fred and Anna. The agency concluded, however, that case law bound the agency to examine the subjective states of mind of the parties at the time they formed their marriage contract. The agency found that Fred's signed request to withdraw his petition made clear that they originally entered into their marriage to obtain an immigration benefit. Other than a quotation from Fred's signed request to withdraw his petition, the agency included no primary-source documents to support its reasoning. For example, counsel for the agency admitted at oral argument that the agency did not provide a transcript of Fred's statement withdrawing the petition until the administrative record was created.

Christopher and Anna then appealed to the Board of Immigration Appeals. The Board affirmed the denial of the petition and denied a motion to reconsider. Christopher and Anna then filed suit. The district court agreed with the USCIS and BIA denying their petition, and the Fligers appealed.

### Analysis

The Fligers properly sued under the Administrative Procedure Act because the decision to deny an I-130 petition is not a discretionary agency decision and Anna is not yet subject to a removal order. See *Sehgal v. Lynch*, 813 F.3d 1025, 1027 (7th Cir. 2016); *Ogbolumani v. Napolitano*, 557 F.3d 729, 733 (7th Cir. 2009). This court's review is deferential to the agency. *Ogbolumani*, 557 F.3d at 733. "The APA requires that an agency's decision be set aside only if it is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence in the case, or not in accordance with law." *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 853 (7th Cir. 2009).

The burden is on the petitioner, Christopher, to establish by a preponderance of the evidence that the beneficiary, Anna, is eligible for the benefit sought. See 8 U.S.C. § 1361. To establish that a marriage is or was not fraudulent, a couple must show that at the time of the marriage, they intended to establish a life together. *Surganova v. Holder*, 612 F.3d 901, 904 (7th Cir. 2010) (discussing in removal context, where government has burden to show couple "never intended to establish a life together"); *Matter of Laureano*,

19 I&N Dec. 1, 2–3 (BIA 1983). The marriage will be considered fraudulent if it was entered into with "the primary purpose of circumventing the immigration laws." *Matter of Laureano*, 19 I&N Dec. at 2; see also *Guan v. INS*, 49 F.3d 1259, 1260 (7th Cir. 1995) (marriages undertaken primarily to evade immigration laws are shams). When assessing the intent at the time of the marriage, the agency and "courts look to both the period before and after the marriage [ceremony]." *Surganova*, 612 F.3d at 904.

On appeal the Fligers first argue that the immigration authorities' decision was arbitrary and capricious because they focused solely on Fred's statement withdrawing the petition. They contend that the agency ignored all the other evidence demonstrating that their 15-year marriage was not a fraud. But Fred's statement withdrawing the I-130 petition is alone sufficient to show that their marriage was not bona fide at its inception, even though he attempted to recant it the following month. Fred signed a statement saying: "While she was working for me, Anna asked me to marry her so she wouldn't be deported and so she could get an immigration benefit. I never lived with Anna Pienkowski nor do I live with her right now." The statement is clear; the primary purpose at the outset of the marriage was for Anna to gain an immigration benefit. This court has concluded before that a statement like this one (that does not explicitly confess to a sham marriage) is sufficient to support an agency finding that a marriage was fraudulent. See *Ogbolumani*, 557 F.3d at 733–34; see also *Ghaly v. INS*, 48 F.3d 1426, 1431 (holding that under APA review, agency decision must stand if a "reasonable mind could find adequate support for the decision").

Further, it was reasonable for the agency to discount Fred's attempt to recant his sworn statement. Courts tend to be suspicious of attempts to retract sworn testimony after it produces some unfavorable result. See *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 750–51 (7th Cir. 2010) (stating change in testimony can affect credibility); *United States v. Peterson*, 414 F.3d 825, 827 (7th Cir. 2005) (after pleading guilty in criminal case, defendant must have compelling explanation for differences in motion to withdraw plea and testimony in plea hearing).

The timing here supports a similarly skeptical view. Fred suddenly changed his testimony the month after receiving an unfavorable result. He claimed that the eye drops he was using rendered him unable to see what he was signing, but he did not claim that it was not explained to him. He also said that he did not understand all the questions, but in support, he said only vaguely that he was "in bad physical and mental state." The BIA reviewed the transcript of Fred's testimony and did not find any evidence that Fred was confused. And more generally, the interview proceedings (which have been recorded in a certified transcript, and were observed by a third-party

witness) have higher evidentiary value than Fred's "affidavit," which was neither sworn nor dated. See *Ghaly*, 48 F.3d at 1432–33 (affirming agency's decision discounting rebuttal evidence presented after one spouse admitted fraud in sworn statement). Likewise the Fligers do not make a persuasive argument that the medical records they submitted to the agency establish that Fred was incompetent, nor do they explain his apparent recovery of his mental faculties within a month of his interview.

The BIA did not rely solely on the written statement on the form withdrawing the petition, as the Fligers argue. Fred first testified under oath that it was Anna's idea to get married and to file the petition. This statement is another important piece of evidence demonstrating their intentions when they decided to marry. See *Ghaly*, 48 F.3d at 1432 (affirming agency's reliance on statement that marriage was fraudulent when no relevant rebuttal evidence was offered). The BIA also listed and considered their evidence about Anna and Fred's 15-year relationship, including vacation photographs, telephone records, a life-insurance policy with Anna as the beneficiary, and an email from a nursing-home employee confirming Anna's visits and support.

The problem with the evidence, as the USCIS, the BIA, and the district court have all pointed out, is that, at best, the evidence supports a finding that Fred and Anna developed a relationship with one another after getting married. There is little evidence other than Fred's oral account to show their intentions at the time they married, and he made clear that the primary motivation was to obtain an immigration benefit for Anna. Anna said nothing at all about it when interviewed, so she has no basis for contradicting Fred's statement now. The attachment to each other that Fred and Anna developed after they got married does not overcome the evidence of their purpose in marrying in the first place. Therefore, the Fligers have not met their burden to show that, in its review of the evidence, the agency "entirely failed to consider an important aspect" of the claim or offered an "implausible" rationale. See *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The agency's attention to the Fligers' evidence also contradicts their argument that the agency made a decision based on a prejudicial assumption that the age difference between Fred and Anna meant the marriage was a sham. Nothing in the record supports the Fligers' suspicion; to the contrary, Anna, and especially Fred, spoke of each other with affection. In any case, considering an age difference is not improper; it is one factor that the agency uses in assessing the legitimacy of a marriage in combination with other fraud indicators such as a new marriage following quickly a divorce (or, one might argue, a death), unusual marriage history, extreme nervousness,

evasive or general answers, and so on. See USCIS Fraud Referral Sheet. But the record does not reflect that age was considered in this case, let alone that it was decisive.

The Fligers' second argument fares no better. They argue that the USCIS violated its own regulation and the Due Process Clause by refusing to provide them with a copy of the withdrawal request; instead the agency provided a summary. The regulation at issue requires the agency to give the petitioner an opportunity "to inspect the record of proceeding which constitutes the basis for the decision." 8 C.F.R. § 103.2(b)(16). The agency also must advise the petitioner if the adverse decision "is based on derogatory information considered by the Service and of which the applicant or petitioner is unaware" so that the petitioner can have the "opportunity to rebut the information and present information in his/her own behalf." *Id.*

We have repeatedly urged the agency to provide the actual statement on which it relied, but we have acknowledged in the past that a summary can suffice. *Sehgal*, 813 F.3d at 1031–32; see *Ghaly*, 48 F.3d at 1437. In this case, the reason was so straightforward that the document would not have been any more enlightening than the verbatim summary. However, we warn the agency that it should not assume that we will continue to tolerate a summary as a general rule. We strongly advise it to start providing the actual evidence on which it relies to make its decision.

In this case, however, the judgment of the district court is AFFIRMED.

CERTIFIED COPY

A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit