# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-3652

MARINA KOVAL and VALERIY VAGIL,

*Petitioners*,

v.

ALBERTO R. GONZALES,
United States Attorney General,

*Respondent*.

———————

Petition for Review of an Order of
the Board of Immigration Appeals.
Nos. A75-259-237 & A75-259-238

———————

ARGUED APRIL 11, 2005—DECIDED AUGUST 16, 2005

———————

Before POSNER, RIPPLE and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Petitioners Marina Koval and Valeriy Vagil seek review of a decision of the Board of Immigration Appeals ("BIA" or "Board") that affirmed the Immigration Judge's ("IJ") denial of their request for asylum. For the reasons set forth in the following opinion, we grant the petition for review, reverse the judgment of the BIA and remand the case for further consideration.

# I

# BACKGROUND

## A. Facts

Mr. Vagil and Ms. Koval, husband and wife, are natives and citizens of Ukraine. They have at least one child who was born in the United States. Mr. Vagil entered the United States on May 17, 1996, with a visitor's visa that was valid until November 17, 1996. On July 4, 1996, Ms. Koval entered the United States with a visitor's visa that was valid until July 3, 1997. They both stayed in the United States longer than permitted, and the Immigration and Naturalization Service initiated removal proceedings. Both conceded removability, and Ms. Koval filed an application for asylum and for withholding of removal on their behalf. At a September 2003 removal hearing, Ms. Koval and Mr. Vagil testified that they feared returning to Ukraine because of their membership in the Church of Jesus Christ of Latter-Day Saints (the "Mormon Church").

### 1.

Ms. Koval presented the following testimony in support of her application. She was baptized into the Mormon Church around March 1993. At the time, she was a university student in Kiev, Ukraine. One month after her reception into the Church, she received a summons from the Soviet Intelligence Service ("KGB"). According to Ms. Koval, at the KGB office, she was interviewed by a man who stated that he knew that she had joined the Mormon Church. The agent also told Ms. Koval that young Americans were visiting Ukraine in order to obtain secret information about the country. The agent further said that the "American spies" were interested in young educated people, and in Ms. Koval

particularly, because she was a physics student with access to "scientific research" and "new materials and super conductivity." A.R.185. He expressed his concern that, as a good citizen, Ms. Koval should not be in contact with the Americans. The agent also requested the addresses of the Americans and warned that Ms. Koval would be punished if she failed to comply.

In May 1993, while Ms. Koval was on vacation, her dorm room was searched; her books about the Mormon faith and her diary were missing. A week after this incident, Ms. Koval again was summoned by the KGB. She was interviewed by the same agent and another man. Ms. Koval testified that the agents told her that, because she had failed to provide any information and because she was attending the Mormon Church, she would not be allowed to continue her physics studies. The agents also warned that, if she did not cease her involvement with the Mormon Church, she "would be in some way isolated from the society because they did not want me allegedly to influence other people." A.R.188.

Despite these threats, Ms. Koval was allowed to graduate and to receive her master's degree in physics. However, according to Ms. Koval, she was denied entrance into the Ph.D. program because the KGB had denied her residence (a "propiska") in Kiev. A.R.188-89. Ms. Koval had earned all "A" grades and was the only student in her program to receive a "red diploma," a mark of distinction. A.R.189.

Without permission to stay in Kiev, Ms. Koval moved to her parents' home in Borispol, Ukraine, about twenty-five kilometers from Kiev. She applied for jobs in various departments at the local airport, at two factories and at a school, but she received no interviews. Ms. Koval testified that she believed that her inability to procure employment was because she had to complete a standardized job ap-

plication form. The form required her to disclose that she had a sister living in the United States and that she was a member of an American church. Ultimately, Ms. Koval's father was able to find her work as a ticket checker at the airport where he was a pilot. She testified that the people who worked in this job were capable only "of some really simple jobs." A.R.194.

After one year and a half, Ms. Koval was hired by an Israeli airline. About one month later, however, she had to leave that position because "the KGB did not allow" her to obtain a passport for business travel outside of the former communist bloc countries. A.R.195. Ms. Koval was told that she could not receive the passport because her sister lived in the United States and because she "was involved with Americans." A.R.197. Ms. Koval later was hired by a Polish airline. At some point thereafter, she was granted a passport. In April 1994, she worked in the United States for about one month as an interpreter for a group of KGB agents and airport employees who were attending computer training. According to Ms. Koval, she was kept under close surveillance, and the KGB held the group members' passports and money in the hotel.

Ms. Koval met Mr. Vagil at a church meeting in 1995. She testified that, at the time, Mr. Vagil was "twice smaller his size of now because he was completely nervous, he was a nervous wreck. He didn't live at home. He lost his job." A.R.199. According to Ms. Koval, Mr. Vagil told her that sometimes he would not eat for several days and that he had not seen his parents in months. He told Ms. Koval that the KGB was calling his parents and had interrogated his mother. The agents had told Mr. Vagil's mother that, if they caught him, they would release him from custody with tuberculosis. According to Ms. Koval, in January 1996, the KGB again summoned Mr. Vagil's parents. Ms. Koval and

Mr. Vagil decided that he no longer could remain in Ukraine. Ms. Koval bought him a plane ticket from the airline for which she worked and, in an effort to avoid detection, arranged for him to depart on a day different from the one listed on his ticket. Ms. Koval married Mr. Vagil two days before he left in May 1996.

After Mr. Vagil left Ukraine, a friend of Ms. Koval's mother called to say that the friend's husband was in jail and that the KGB had said they would release him if he reported about Ms. Koval. Ms. Koval testified that she began to notice that "every time I was working this specific flight," the head of the KGB was present. A.R.204. Also, "one guy" would be next to her "all the time" allegedly for training, and he would ask her questions such as how to pass information from Poland to America. A.R.204. Finally, on June 25, 1996, Ms. Koval again was summoned to meet with the KGB. She decided to leave Ukraine at that point.

After Ms. Koval's departure, the KGB directed her parents to sign a paper promising to bring her to the KGB if they saw her again. In August 1996, Ms. Koval's father was found dead. The death certificate listed the cause of death as drowning. Ms. Koval testified that her father was in excellent physical condition and that she did not believe that he had died of natural causes. Ms. Koval's sister stated in an affidavit that she believed their father had passed away because "he could not handle the stress caused by his daughter's persecution." A.R.559. Ms. Koval testified that she never was arrested, detained overnight or physically tortured by the KGB.

## 2.

Mr. Vagil also testified on his own behalf. He joined the Mormon Church in 1991. According to Mr. Vagil, he began receiving rude telephone calls in 1994 from unknown per-

sons who asked him why he was attending the American church. He received about ten such calls between October and December 1994. In January 1995, the KGB interrogated him and told him that he was expected to provide a list of the Ukrainian members of his local parish and the names of the missionaries who worked with that church.

The following March, after Mr. Vagil had failed to provide such information, KGB agents warned him that, if he did not cooperate, they "would find the ways to ruin my career, my health, and they would be able just to simply throw me into jail." A.R.225.

In 1996, the KGB came to Mr. Vagil's parents' home in search of him; the KGB also summoned his parents for questioning and told them that Mr. Vagil would be harmed if he did not cooperate. Mr. Vagil became frightened and decided to leave the country. He testified that he never was arrested, detained or physically abused in Ukraine; his parents still live in Ukraine and are employed.

### 3.

In support of their application for asylum, Ms. Koval and Mr. Vagil submitted the testimony of Leonid Stonov, the international director of the Union of Councils of Jews in the Former Soviet Union, a human rights monitoring organization. He testified that Ms. Koval's application was consistent with his knowledge of the treatment of Mormons in Ukraine. Specifically, he stated that non-traditional religions such as Mormons are considered sects and face pressure from the official Russian Orthodox Church. He also testified that Ukraine society discriminates against all non-traditional religions in that such churches are not allowed to register; consequently, they cannot build churches, and their activities may be classified as illegal.

Ms. Koval and Mr. Vagil also sought to introduce the testimony of Yuriy Shvets regarding the activities of the KGB and its successor organization, the Security Service of Ukraine ("SBU"), with respect to Mormons. Shvets had worked as a KGB agent in Ukraine from 1980 until 1990; he was assigned to a department that monitored the daily activities of the churches in the Soviet Union. Shvets stated that he "was well aware of the real policy of the Soviet government towards religion and of the KGB methods of dealing with those church leaders and believers who did not follow the 'party line.' " A.R.514. Shvets also stated that he had maintained contacts with the sources he had developed in the KGB. At the time of the removal hearing, Shvets was working as a private consultant to the United States Government on security issues involving Russia and Ukraine.

Shvets testified that Ms. Koval's account of harassment was consistent with his knowledge of the KGB. He found it "inevitable" that Ms. Koval "immediately" had been in "serious trouble" for adopting the Mormon faith. A.R.516. Shvets stated that the growing number of Ukraine citizens joining other religious groups has become a grave threat to the influence of the Orthodox Church. He explained that a young intellectual, such as Ms. Koval, would have drawn increased attention because she was considered capable of spreading ideological views. According to Shvets, the KGB believed that American religious missions were controlled by the Central Intelligence Agency or the Federal Bureau of Investigation. The Mormon Church still is perceived to have close ties with the United States Government. Shvets testified to his view that the nature of the SBU "essentially has not changed since the collapse of the Soviet Union." A.R. 515-16.

Shvets further testified that he believed that Ms. Koval's fear of persecution should she return to Ukraine was "rea-

sonable and well founded" based on "her religious belief and her defiant attitude towards the [SBU]." A.R.515. He explained that the KGB's failed attempt to recruit Ms. Koval in order to reach American missionaries was a serious security lapse and possibly a political embarrassment because it involved American missionaries. Shvets opined that, once Ms. Koval left for the United States,

> she crossed the point of no return. It is the worst nightmare for the SBU. Now, they must be sure that she already has reported to the U.S. authorities about attempts of the SBU, representing the friendly government of Ukraine, to target American missionaries who pay taxes to bring humanitarian aid to Ukraine. Potential ramifications of such revelations might be personally disastrous to those in the SBU who devised, conducted, and authorized the operation. It represents a great personal security risk for the applicant. I strongly believe the SBU would pay dearly to get hold of her and silence her.

A.R.517. Shvets strongly believed that Ms. Koval's "life would be in danger should she return to Ukraine." *Id.*

In Shvets' view, Mr. Vagil faces a similar situation as a Mormon, an intellectual and someone who knows of specific SBU activity against Mormons and American missionaries.

## B. Administrative Proceedings

The IJ found Ms. Koval and Mr. Vagil to be credible. The IJ admitted the testimony of Stonov. The IJ noted, however, that Stonov had defined "persecution" to mean societal discrimination that is not government-sponsored and the refusal of permits for churches. The IJ excluded the testimony of Shvets. Relying on Federal Rule of Evidence 702 for

guidance, the IJ determined that Shvets was not qualified as an expert regarding the current treatment of Mormons in Ukraine. Specifically, the IJ concluded that Shvet's testimony was not "based on sufficient facts or data," insofar as he had not traveled to Ukraine in about twelve years and he was not working with issues related to Mormons in Ukraine. A.R.44.

The IJ then concluded that, although Ms. Koval and Mr. Vagil "suffered hardship and harassment, they did not suffer persecution." A.R.48. The IJ relied on the fact that they had been able to practice their Mormon faith and that neither was arrested, detained or physically assaulted in Ukraine. Also, the IJ took the view that Ms. Koval's inability to pursue her Ph.D. and her difficulty in obtaining work in her field did not amount to severe economic deprivation. With respect to Mr. Vagil, the IJ concluded that no evidence reflected that the KGB had followed through on its threat to ruin his health and career. Finally, the IJ gave sizeable weight to Ms. Koval and Mr. Vagil's ability to obtain valid passports and visas to the United States, which undermined any notion of "strict government control." *Id.*

With respect to the well-founded fear of persecution standard, the IJ concluded that, on the basis of the country reports prepared by the United States Department of State and other documentary evidence, "there is harassment and bureaucratic delays with non-native religions, but generally there is not severe mistreatment or persecution." A.R.50. The IJ again noted that Ms. Koval and Mr. Vagil had been able to obtain valid passports and visas to leave Ukraine. In addition, the IJ decided that, although soon after Ms. Koval and Mr. Vagil fled the country their parents were interrogated, nothing indicated that this harassment had continued.

The BIA affirmed the IJ's decision without opinion.

## II

## ANALYSIS

### A.  Standard of Review

"Where, as here, the BIA summarily affirms, we review the immigration judge's opinion as if it were that of the BIA." *Huang v. Gonzales*, 403 F.3d 945, 948 (7th Cir. 2005). We limit our review to determining if the IJ's decision is supported by substantial evidence. *Kharkhan v. Ashcroft*, 336 F.3d 601, 604 (7th Cir. 2003). We shall uphold the IJ's asylum eligibility finding as long as it is " 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.' " *Id.* (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)).

### B.  Asylum

Ms. Koval and Mr. Vagil challenge the IJ's denial of asylum on three grounds: (1) that past persecution was established based on Ms. Koval's economic deprivation; (2) that a well-founded fear of future persecution was established on the fact that Mr. Vagil faces imprisonment in Ukraine if returned and that Ms. Koval faces severe mistreatment through "crushing, economic pressure"; and (3) that the IJ erroneously excluded the testimony of Shvets. Appellants' Br. at 29-30.[1] Section 208(a) of the Immigration

---

[1] The Immigration Judge also held that Ms. Koval's and Mr. Vagil's failure to show a well-founded fear of persecution meant that they could not meet the more stringent standard of a

(continued...)

and Nationality Act ("INA"), 8 U.S.C. § 1158(b), grants the Attorney General broad discretion to grant asylum to an applicant who qualifies as a refugee. A refugee is defined as "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

A showing of past persecution creates a presumption that the applicant has a well-founded fear of persecution and therefore should be granted asylum. *See* 8 C.F.R. § 208.13(b)(1); *see Capric v. Ashcroft*, 355 F.3d 1075, 1084 (7th Cir. 2004). This presumption is rebutted, however, if the Government shows by a preponderance of the evidence that fundamental changes in the conditions in the applicant's country of nationality have occurred such that he no longer has a well-founded fear of being persecuted if returned. 8 C.F.R. § 208.13(b)(1)(i)(A); *see Capric*, 355 F.3d at 1084. The presumption of a well-founded fear of persecution also can be overcome by a preponderance of the evidence showing that the applicant could avoid persecution by relocating to another part of his home country and that it would be reasonable to expect him to so relocate. 8 C.F.R. § 208.13(b)(1)(i)(B); *see Capric*, 355 F.3d at 1084.

---

(...continued)
clear probability of persecution, as required for withholding of removal under 8 U.S.C. § 1231(b)(3) or under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, 8 C.F.R. § 208.13(c)(1). Ms. Koval and Mr. Vagil do not challenge this determination on appeal. We shall therefore confine our review to the IJ's decision regarding asylum.

Alternatively, even if the applicant was not subjected to past persecution, he may put forward evidence that he possesses a genuine fear of enduring persecution if returned to his country of origin and that a reasonable person would fear persecution if returned to that country. 8 C.F.R. § 208.13(b)(2); *Capric*, 355 F.3d at 1085. The objective component of the well-founded fear standard requires the asylum applicant to show: (1) that a reasonable possibility exists that he "would be singled out individually for persecution"; or (2) that there is "a pattern or practice of persecution of an identifiable group," to which the applicant establishes he belongs, such that his fear is reasonable. *Capric*, 355 F.3d at 1085 (citing 8 C.F.R. § 208.13(b)(2)).

### 1. Past Persecution

Ms. Koval submits that the level of economic treatment she suffered, on account of her membership in the Mormon Church, before leaving Ukraine amounted to past persecution. Although the INA does not define "persecution," this court repeatedly has explained that the conduct "need not necessarily threaten the petitioner's life or freedom," but must "rise above the level of mere 'harassment.' " *Borca v. INS*, 77 F.3d 210, 214 (7th Cir. 1996); *see Naveed Ahmed Sahi v. Gonzales*, No. 04-2828, 2005 WL 1713417, at *1 (7th Cir. July 25, 2005). Actions that might constitute persecution include "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings or torture," *Begzatowski v. INS*, 278 F.3d 665, 669 (7th Cir. 2002) (internal quotation marks and citation omitted), or threats of such action, *Capric*, 355 F.3d at 1084.

Economic hardship also is a "form of persecution and independent ground for asylum." *Id.* at 1092. The IJ concluded that the economic difficulties experienced by

Ms. Koval were not sufficiently severe to constitute persecu-
tion:

> [Ms. Koval's] testimony that she was refused entrance
> to the Ph.D. program for failing to provide the KGB
> with information also does not rise to the level of past
> persecution. Both she and her husband completed
> higher educations and maintained employment in
> Ukraine. Although [Ms. Koval] testified that she had
> difficulty finding a job after graduating with her M.A.,
> she did not suffer severe economic deprivation. *Cf.*
> *Matter of Acosta*, 19 I&N Dec. 211, 222 (BIA 1985) (rec-
> ognizing that "economic deprivation or restrictions so
> severe that they constitute a threat to an individual's life
> or freedom" may constitute persecution), *overruled on
> other grounds by Matter of Mogharrabi*, 19 I&N Dec. 439
> (BIA 1987).

A.R.48. Ms. Koval contends that the IJ erred as a matter of
law by requiring her to show that the economic mistreat-
ment amounted to a threat to her life or freedom.[2]

We agree that the IJ held Ms. Koval to an impermissibly

---

[2] The Government suggests that the IJ did not apply a standard
that the economic deprivation must have threatened Ms. Koval's
life or freedom, because, in citing to *In re Acosta*, 19 I. & N. Dec.
211 (BIA 1985), the IJ used the introductory signal "cf."
Appellee's Br. at 32. It is true that "cf." ordinarily indicates that
the "[c]ited authority supports a proposition different from the
main proposition but sufficiently analogous to lend support." The
Bluebook: A Uniform System of Citation R. 1.2(a), at 47 (Colum-
bia Law Review Ass'n et al. eds., 18th ed. 2005). However, *Acosta*
is the only source of authority cited by the IJ. The only reasonable
inference is that the IJ relied on *Acosta*, and the standard articu-
lated therein, in assessing whether Ms. Koval's economic
disadvantage rose to the level of persecution.

high standard for establishing persecution. Although the conduct in question must rise to more than "harassment" or "generalized conditions of hardship which affect entire populations," *Capric*, 355 F.3d at 1084, it "need not necessarily threaten the petitioner's life or freedom," *Borca*, 77 F.3d at 214 (internal quotation marks and citation omitted); *see also Bace v. Ashcroft*, 352 F.3d 1133, 1138 (7th Cir. 2003) (stating that persecution includes "actions less severe than threats to life or freedom" (internal quotation marks and citation omitted)). More specifically, this court has established that, to demonstrate economic persecution, an applicant does not need to show a "total deprivation of livelihood" on account of his protected status. *See Borca*, 77 F.3d at 216. Rather, a showing of a "probability of deliberate imposition of substantial economic disadvantage" can be sufficient. *Id.* In *Borca*, for example, we noted that, upon remand to the BIA, the asylum applicant might be able to establish persecution because she was fired from her position as a radiologist and was barred from government employment, except possibly as a farm laborer. *Id.* at 215-17; *cf. Capric*, 355 F.3d at 1092-93 (deciding that loss of job and apartment based on religion and ethnicity was not economic persecution when government had provided the applicant eight months to find a new residence, his wife had remained employed, applicant had not attempted to find other work and the regional economic conditions in general were harsh).

On remand, consideration of the evidence under the appropriate standard might compel a finding that Ms. Koval suffered economic persecution on account of her religion and membership in the Mormon Church. Specifically, the government prevented her from continuing her education in the Ph.D. physics program, denied her permission to live in Kiev and reduced her to working in menial jobs that required no education, training or acuity. Ms. Koval was

denied employment in her chosen field or indeed in any allied field. Certainly, Ms. Koval's advanced education would have been of some greater use than taking tickets. The difficulties experienced by Ms. Koval particularly are troubling when the record is considered as a whole—the discrimination she experienced, the mistreatment faced by Mr. Vagil, her father's death shortly after she fled to the United States, and the corroborating testimony about the past and current treatment of Mormons in Ukraine.

### 2. Fear of Persecution if Returned to Ukraine

Ms. Koval and Mr. Vagil also expressed fear that they will face persecution in Ukraine on account of their membership in the Mormon Church. Evaluation of this contention presented the IJ with several challenges that we believe required significantly more attention, and circumspection, than they received if the petitioners were to have had a fair hearing. First, the petitoners' claim required the IJ to assess the infringement of religious liberty in the former Soviet Union states. Evaluation of this issue requires that the IJ consider the complex relationship among civil authorities, the Russian Orthodox Church and non-native religions, especially those perceived to have connections, historical or contemporary, with the United States. The record contains significant evidence that Mormons are considered to be adherents to an "American religion" and therefore are considered to pose an especially potent threat to the established order. The effect of this perception on the fate of the petitioners, should they be required to return to that country, must be evaluated with great care. This particular human rights situation is a relatively new one, and judges have a particular obligation to base their judgments only on factual predicates that are developed fully and carefully as circumstances permit. It is especially important, in such a

context, that an IJ take special care to ensure that *both* parties have an ample opportunity to present as comprehensive a picture as possible of the circumstances that precipitated the petitioners' departure and that are likely to greet them.

We have serious reservations as to whether the record in this particular case was developed and evaluated with a sufficient appreciation of these concerns, especially the need for even-handedness in evaluating evidentiary submissions. In making his determination with respect to whether the petitioners manifested a well-founded fear of persecution, the IJ refused to consider, as a matter of law, the testimony of Shvets because he deemed it to lack an adequate factual predicate. The IJ then proceeded to hold that Ms. Koval and Mr. Vagil had no valid claim of future persecution, the issue to which Shvets' testimony spoke directly. The IJ based his conclusion substantially on the State Department country reports that, in his view, did not indicate severe mistreatment of Mormons in Ukraine.

We have noted that immigration courts "reasonably may rely upon the State Department's assessment of current country conditions as they relate to the likelihood of future persecution, given the Department's expertise in international affairs." *Toptchev v. INS*, 295 F.3d 714, 722 (7th Cir. 2002); *see Vaduva v. INS*, 131 F.3d 689, 691 (7th Cir. 1997). We also have made clear, however, our concern regarding "the immigration service's chronic over reliance on such reports." *Niam v. Aschroft*, 354 F.3d 652, 658 (7th Cir. 2004); *see, e.g., Bace*, 352 F.3d at 1139; *Galina v. INS*, 213 F.3d 955, 959 (7th Cir. 2000). Our concern has been shared by our sister circuits. One of those circuits has cautioned that "the determination of whether or not a particular applicant's fear is rebutted by general country conditions information requires an individualized analysis that focuses on the specific harm suffered and the relationship to it of the particu-

lar information contained in the relevant country reports." *Chand v. INS*, 222 F.3d 1066, 1079 (9th Cir. 2000); *see also Krastev v. INS*, 292 F.3d 1268, 1277 (10th Cir. 2002) (stating that reliance on a country report "does not substitute for an analysis of the facts of each applicant's individual circumstances" (internal quotation marks and citation omitted)).

One particular shortcoming of the country reports is of special concern in the situation we face in this case. State Department country reports are anonymous in their authorship. Decision-makers in the asylum determination process do not know the identity of the author, the credentials of the individuals who assemble the reports, or the trustworthiness of the evidence upon which the assessments contained in these reports are based. Indeed, these reports have a certain *ipse dixit* quality to them. As we have noted previously, the country reports are prepared in general terms and offer more of a statement on the relationship of the United States Government to that country than an account of individual circumstances. *See, e.g.*, *Galina*, 213 F.3d at 959 (noting that country reports are "brief and general, and may fail to identify specific, perhaps local, dangers to particular, perhaps obscure, individuals"); *El Moraghy v. Ashcroft*, 331 F.3d 195, 204 (1st Cir. 2003) (noting that country reports should be used for purposes of providing "context and generalized credibility assessment"). Moreover, the asylum applicant certainly has no realistic opportunity to verify the truth of the assertions contained in these reports through cross-examination or otherwise. *Diallo v. Ashcroft*, 381 F.3d 687 (7th Cir. 2004) (stating concern that country reports have "potential for bias" and that asylum-seekers are unable to question the conclusions contained therein); *Niam*, 354 F.3d at 658 (noting that, because the authors of the country reports are anonymous, the asylum applicant effectively is denied the right of cross-examination). If we are to continue

to allow reliance on such evidence,[3] basic fairness requires that the IJ keep in mind both the practical limitations of these reports *and* the practical limitations on asylum applicants to present other expert testimony and other evidence to rebut the *ipse dixit* assertions of the reports. "Asylum applicants are entitled to respond to claims of changed country conditions." *Gailius v. INS*, 147 F.3d 34, 45 (1st Cir. 1998). That opportunity must be a realistic one.

In this case, although Shvets had not been to Ukraine in about twelve years, he testified that he had contacts with recently retired agents of the KGB and that, because of his background and continued contacts, he understood the dynamics of the religious situation in Ukraine. Shvets also testified that he serves as a consultant to the United States Government with respect to security and intelligence issues in Russia and Ukraine. With this background, Shvets certainly had information that was relevant to the determination that the IJ had to make, and we can see no basis for refusing to admit it while not only admitting, but relying so heavily on, the State Department's anonymous country reports. Notably, Shvets was able to offer significant information on the Ukraine intelligence office, its attitude towards Mormons and how its agents were likely to treat an individual who had rebuffed their solicitations to become involved in counterintelligence. According to the testimony of Ms. Koval, which the IJ found credible, the Ukrainian

---

[3] This court has indicated that, although the Federal Rules of Evidence do not apply to administrative agencies, "the spirit of" the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which sets forth the rules for qualifying an expert witness in federal trials, "does apply to administrative proceedings." *Niam v. Aschroft*, 354 F.3d 652, 660 (7th Cir. 2004).

officers had attempted but had failed to enlist her assistance in infiltrating the Mormon Church, a church they regarded as a tool of American intelligence agencies. Notably, even the country report admits to some exceptions to its general assertion that conditions for non-native religions in former Soviet Bloc countries are improving.[4] Ms. Koval and Mr. Vagil credibly testified to such a situation, but the IJ refused to permit them to develop the point with testimony that was clearly relevant. According to the Profile of Asylum Claims and Country Conditions for Ukraine, although the Ukrainian Government

> does not discriminate against, or take measures against, individual believers on the basis of their faith, Evangelical Christian missionaries reported some instances of societal discrimination against members of their churches, such as salary cuts, layoffs, and public criticism for betraying "native religions." Asylum applicants frequently describe physical violence directed against them by nationalist or other groups, but we have no reporting to indicate that such behavior is widespread or systematic.

A.R.401. Shvets' testimony, had it been considered, would have placed that broad statement in a very different light than the one in which it was placed by the IJ. He would have testified that, in essence, the SBU had both the inclination and the resources to make life difficult and dangerous for Ms. Koval and Mr. Vagil. The exclusion of his testimony was improper; it prevented the petitioners from showing that the broad assertions of the country report

---

[4] The 2002 Country Report focuses largely on some bureaucratic difficulties that non-native religions had faced in obtaining plots of land for building churches and some instances of restricted church activity, unrelated to individuals.

were indeed subject to qualification—a qualification that might well have made a difference in this case.

## Conclusion

For all of the foregoing reasons, we grant the petition for review. The judgment of the BIA is reversed. The case is remanded for proceedings consistent with this opinion.

REVERSED and REMANDED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*