In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3478

NDEYE F. TOURE,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent*.

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A098-510-529

ARGUED SEPTEMBER 9, 2009—DECIDED OCTOBER 8, 2010

Before FLAUM, EVANS, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Ndeye F. Toure, a citizen of the
Republic of the Congo, maintains that she arrived in
the United States on June 13, 2004 after being transported
here by a smuggler. In October 2004, Toure applied for
asylum, withholding of removal, and protection under
the United Nations Convention Against Torture ("CAT").
The immigration judge ("IJ") denied Toure's applica-
tion, in part based on an adverse credibility determina-

tion and Toure's failure to prove that she applied for asylum within a year of arriving in the United States. Toure appealed the IJ's denial to the Board of Immigration Appeals ("BIA") and filed a motion to reopen based on ineffective assistance of counsel. The BIA affirmed the IJ's decision and also denied Toure's motion to reopen. Toure now petitions this court for review. Finding that substantial evidence supported the BIA's findings and that the BIA did not abuse its discretion in denying Toure's motion to reopen, we deny the petition for review.

## I. BACKGROUND

Ndeye F. Toure is a native and citizen of the Republic of the Congo ("ROC"). Toure is a member of the Lari tribe and lived most of her life in Pointe Noire, where she shared a farmhouse with her husband, children, mother, father, and two brothers. The ROC has been plagued by civil unrest since the 1960s, and in 2002, the ROC experienced an increased number of violent outbreaks between warring political factions after a series of rigged elections. Toure states that her family fell victim to this violence in 2002, when armed men entered the family home, ransacked it, killed the family dog, and stole the family's belongings. Fortunately for Toure's family, however, they had received a warning from neighbors moments earlier that armed individuals were approaching the neighborhood, allowing them enough time to hide in the back yard and evade the intruders. Toure looked on from her hiding place as the intruders destroyed the family's home and shot the dog. She states that she did not recognize any of the intruders and

could not determine what tribe or political group they were from.

Toure reports that a similar incident occurred in March 2004, when another group of unknown intruders entered Toure's residence. On this occasion, only Toure and her mother were at home. Toure's father was apparently out working in the fields, her brothers had gone out, and Toure's husband had taken the children to the store where he worked in the town market. At some point, Toure heard noises coming from outside her mother's bedroom and went outside to investigate. The next thing Toure says she remembered was waking up inside a sparsely furnished room that appeared to be a store. Toure states that she did not know exactly what happened at the family's house, but surmised that one of the intruders hit her in the back of the head, knocking her unconscious, and then brought her to this unknown location. Toure never actually saw any of her captors and does not know why she was targeted, but she believes that they were civilians who were members of an opposing political group or a different ethnic group.

Shortly after regaining consciousness, Toure realized that there were also two men in the room where she was being held. They told Toure that they had been kidnaped that day during another attack at the town market. Toure states that she asked the two men why she was being held, to which they responded that they had been asking themselves the same question. According to Toure, she did not know the two men, but they claimed to recognize her from the market where her husband worked. The two men told Toure that a fight between two ethnic

groups had broken out at the market and that everyone began to flee. Toure states that the two men also told her that they believed that some of Toure's relatives had been killed in the attack. This belief was based on them having allegedly seen Toure's husband trying to flee the market with their children during the melee. Toure maintains that the two men told her that the fight began in the fields and then spread to the market, which led Toure to believe that her father had also been killed. Toure alleges that at some point during the conversation, the men told her that her family home had been ransacked by the same attackers who started the fight in the fields and market. When asked by the IJ how the two men would know anything about her house in particular being ransacked, Toure testified that she was unsure but that it was possible that they saw the home being ransacked as they were being transported to the location where they were held captive.

According to Toure, the two men next told her that they had hatched an escape plan, which involved breaking down the door to the room where they were being held. The men asked Toure if she wished to join them, which she did. Toure states that the men were able to break down the door that night, and they all ran into the forest. After walking for most of the night, they came upon a hut in the woods. Inside was an old woman, whom they begged for food and something to drink. The woman obliged, but told them that they needed to move on. They continued walking and eventually met a truck driver. Toure convinced him to take them to Gabon, a small country to the immediate west of the ROC. Toure states that she and her fellow captives stayed

in Gabon for two months. She left after meeting a smuggler who transported her to the United States.

Toure claims that she arrived at John F. Kennedy International Airport on June 13, 2004. In October 2004, Toure began the affirmative application process for asylum, withholding of removal, and CAT relief. The affirmative application process allows aliens not already involved in immigration proceedings to apply for asylum within one year of arrival and to be interviewed in a non-adversarial manner by an agent from the United States Citizenship and Immigration Service. If the application is not approved, as occurred with Toure's application, the case is referred to an IJ for de novo consideration. Toure first appeared before the IJ in December 2004 and conceded removability. Alexandra Branick, Toure's attorney at the time, informed the IJ that they planned to submit proof of the date Toure had arrived in the United States in the form of "affidavits from individuals." Branick agreed to submit the proof by December 15, 2005, and the IJ scheduled the removal hearing for January 6, 2006. The hearing was later rescheduled for March 20, 2007.[1]

---

[1] By the time of the January 2006 hearing, Branick, who was employed at the Law Offices of Susan Fortino-Brown during her representation of Toure, was no longer with the law firm, so Fortino-Brown began representing Toure. On the morning of the hearing, everyone was present in the courtroom with the exception of Fortino-Brown, who never showed up due to a scheduling error. The IJ continued Toure's removal hearing until March 20, 2007 because Toure's attorney was not present.

(continued...)

At the removal hearing, Toure's testimony was rife with inconsistencies between her statements on the record and her first and second asylum applications. Among these discrepancies were the length of time she had been held captive (her first asylum application stated that she was held for weeks, but she testified on direct examination that she was only held for one day); whether she had been pregnant at the time of her capture and miscarried while being held captive (information that she revealed for the first time during cross-examination); whether her father had been shot during the 2002 incident (in the February 2006 asylum application, she stated that her father was shot by rebels, but on cross-examination she testified that he was not and that the statement on the application must have been a mistake); and whether her children and brothers were alive (on direct examination she said that she did not know where they were or if they were alive, but on her asylum application she said that they were in Senegal).

Questions about Toure's identity also arose when she presented a card she claimed was her ROC national identification card. One problem with the card was that it contained an inaccurate birth date—the card stated that Toure was born on March 26, 1965, which contradicted her testimony on direct examination that she was born on March 23, 1965 and her testimony on cross-examination that she was born on March 28, 1965. More

---

(...continued)

In the interim, Toure filed a second asylum application in February 2006.

troubling was the baffling story of how Toure obtained the card. She claimed that she received the card the previous week and that someone had dropped it off at her house, although she did not know who had done so. Toure explained that the card was sent to her from the ROC by a man she did not know, but who was willing to help her based on a reference from a mutual friend. Toure said that she had simply sent the man a picture of herself and that he obtained the identification card by going to city hall and presenting the picture, which they used to confirm Toure's identity.

One of the only assertions Toure consistently made during her testimony was that she did not know who had attacked the family or who might attempt to do so upon her return. Toure stated repeatedly that she has "enemies that I didn't know." She was similarly unable to offer any non-conjectural reason for why the unknown attackers had targeted her family. She testified, "I didn't know the people who attacked me. I didn't know their reasons for the attack." At one point, Toure speculated that the attacks were committed by members of a political party. Although she herself had never been interested or involved in politics, Toure theorized that her father's political activities might have been the reason for the attacks. Toure could not explain the extent of her father's involvement in politics aside from his being a "supporter" of a former president, nor could she identify the political party of which her father was a member.

After hearing Toure's testimony, the IJ rendered an oral decision denying Toure's applications for asylum, with-

holding of removal, and CAT protection. First, the IJ found that Toure lacked credibility and noted several discrepancies between her testimony and asylum applications. The IJ found that the inconsistencies, when taken as a whole, cast serious doubt on Toure's claims. Ultimately, the IJ determined that Toure had not testified truthfully and found her ineligible for asylum and withholding of removal. The IJ further concluded that Toure failed to show by clear and convincing evidence that she filed the first asylum application within a year of arrival. As a third basis for her denial of the asylum application, the IJ found that Toure's speculative beliefs about the unknown attackers and their reasons for targeting her family were insufficient to establish past persecution or a likelihood of future persecution. Finally, the IJ rejected Toure's application for CAT protection finding that it was unlikely that Toure would be tortured if she returned to the ROC.

Toure appealed the IJ's decision to the BIA and filed a motion to reopen the proceedings based on ineffective assistance of counsel. Toure alleged that her former attorney, Susan Fortino-Brown, had been ineffective in representing her because she failed to accurately portray Toure's version of events, thereby leading to the IJ's unfavorable credibility determination. Toure attributes any mistakes in the record to translation problems since she primarily speaks French and Fortino-Brown does not. Along with an affidavit and a copy of her bar complaint against Fortino-Brown, Toure attached to the motion an affidavit dated January 28, 2008 from Libasse Dia to corroborate Toure's purported date of arrival. The affidavit stated that Dia saw Toure sitting in front of a

mosque in Brooklyn on June 13, 2004, and, realizing that Toure needed help, advised her of a Congolese community in Indiana that she should consider since she had no relatives in the United States. The affidavit further avers that Dia then gave Toure a ride to the bus terminal (presumably so that Toure could begin her journey to Indiana).

In a written order entered in August 2008, the BIA affirmed the IJ's denial of Toure's application for asylum, withholding of removal, and CAT protection. The BIA agreed with the IJ's determination that Toure's application was time-barred and affirmed the IJ's finding that Toure was not credible. The BIA next determined that, even if it assumed Toure was credible, she had failed to establish that the attacks on her family constituted persecution or that the attacks were related to political opinion on any ground protected under the Immigration and Nationality Act, 8 U.S.C. § 1101(42). The BIA also denied Toure's motion to reopen, finding that Toure had not shown that Dia's affidavit was previously unavailable or that she suffered prejudice. Toure now seeks review of the BIA's order.

## II. ANALYSIS

When Toure's petition was initially filed, one of the threshold questions was whether we had jurisdiction to review Toure's motion to reopen because, under our precedent at the time, we lacked jurisdiction to review denials of motions to reopen. *See Kucana v. Mukasey*, 533 F.3d 534, 536 (7th Cir. 2008). During the pendency of

this case, however, the Supreme Court overruled this precedent and instead held that federal courts have jurisdiction to review the BIA's denial of a motion to reopen. *Kucana v. Holder,* 130 S. Ct. 827, 831 (2010). Therefore, we will address the merits of the BIA's denial of withholding of removal and CAT protection, as well as its denial of Toure's motion to reopen.[2] Where, as here, the BIA affirms the IJ's decision and supplements with its own explanation for denying the appeal, we review the IJ's decision as supplemented by the BIA's reasoning. *Juarez v. Holder,* 599 F.3d 560, 564-65 (7th Cir. 2010).

## A. Withholding of Removal and CAT Protection

We turn first to the denial of Toure's applications for withholding of removal and CAT protection. We review the IJ's denial of Toure's requests for relief under the highly deferential substantial evidence test. Under that standard, "we must uphold the IJ's findings if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole; we may reverse the IJ's determinations only if we determine that the evidence *compels* a different result." *Balogun v. Ashcroft,* 374 F.3d 492, 498 (7th Cir. 2004) (emphasis in original).

---

[2] As both parties agree, we do not have jurisdiction to review the BIA's determination that Toure's asylum application was untimely. 8 U.S.C. § 1158(a)(3); *Ogayonne v. Mukasey,* 530 F.3d 514, 519 (7th Cir. 2008).

An alien is entitled to withholding of removal if he can show a "clear probability" that his "life or freedom would be threatened . . . because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). To meet this standard, an alien must show that he was subject to past persecution or that it is more likely than not that he will suffer persecution in the future if he is removed. 8 C.F.R. § 1208.16(b). A showing of past persecution creates the rebuttable presumption of future persecution. *Id.* "[P]ersecution entails punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Khan v. Filip,* 554 F.3d 681, 690 (7th Cir. 2009) (citation and internal quotation marks omitted). It is not necessary for an alien to "show that her life or freedom were threatened, but the harm she suffered must rise above the level of 'mere harassment' and must result from more than unpleasant or even dangerous conditions in her home country." *Nakibuka v. Gonzales*, 421 F.3d 473, 476 (7th Cir. 2005).

Here, the IJ determined that, even when Toure's asylum claim was considered on the merits, it was unsuccessful because she failed to establish that she had a well-founded fear of persecution on account of any protected characteristic. Toure's failure to prove persecution sufficient to establish asylum necessarily means that she cannot meet the standard for withholding of removal. This is so because to qualify for withholding of removal, one must show "a clear probability" of persecution, which is a higher standard than that required to establish "a well-founded fear" of persecution for asylum.

*Kholyavskiy v. Mukasey,* 540 F.3d 555, 568 n.14 (7th Cir. 2008); *see Kaharudin v. Gonzales,* 500 F.3d 619, 623 (7th Cir. 2007) (observing that withholding of removal requires the petitioner to establish a "clear probability that she will face persecution" and that this is a "more stringent burden than that applied to asylum claims").

The IJ's finding that Toure had not shown past persecution was amply supported by the record. Despite Toure's attempt to establish past persecution by referencing the 2002 and 2004 attacks, the IJ properly concluded that, even if true, those events could not constitute persecution because there was no nexus between the attacks and the racial background or political views of Toure or her family. Toure herself repeatedly testified at the removal hearing that she had no idea who the attackers were, what ethnic group they belonged to, or why they attacked her and her family. She also spoke of the ROC's civil war and competing rebel groups causing violence throughout the country. The level of overall danger in the country, however, is not a sufficient basis to find persecution. *See Ahmed v. Gonzales*, 467 F.3d 669, 673 (7th Cir. 2006) ("Persecution is not so broad a concept as to encompass all that we regard as 'unfair, unjust, or even unlawful or unconstitutional.' Persecution . . . results from more than simply 'unpleasant or even dangerous conditions in [the applicant's] home country.'") (citations omitted). Rather, Toure must somehow connect these dangers to the persecution of herself or other members of her group, showing that people with her political opinion, religion, or ethnic background were being targeted. Her inability to show that the harm inflicted was related to a protected characteristic rather than a harm

suffered by the general population indicates that this was not persecution, but more likely the consequence of general country warfare. *Sivaainkaran v. I.N.S.*, 972 F.2d 161, 165 (7th Cir. 1992).

Toure's claim that she had a well-founded fear of future persecution also fails. In order to establish a well-founded fear of future persecution, "an alien must not only show that his or her fear is genuine but must establish that a reasonable person in the alien's circumstance would fear persecution. A petitioner can meet the objective component through the production of specific documentary evidence or by credible persuasive testimony, while the subjective component turns largely upon the applicant's own testimony and credibility." *Gomes v. Gonzales*, 473 F.3d 746, 755 (7th Cir. 2007) (citations and internal quotation marks omitted). The IJ found that Toure was not a credible witness and denied her applications for asylum and withholding of removal on that basis. We accord substantial deference to an IJ's credibility determination if it is supported by "specific, cogent reasons that bear a legitimate nexus to the finding." *Torres v. Mukasey,* 551 F.3d 616, 626 (7th Cir. 2008).

Based on Toure's testimony at the 2007 hearing alone, the IJ had sufficient grounds to find her testimony incredible. Toure's testimony was replete with material inconsistencies, including the length and conditions of her confinement, her knowledge about the whereabouts of her brother and children, and whether her father had been shot during the 2002 incident. It also appeared that Toure was supplementing some of her earlier state-

ments by adding new facts about the attacks, such as her waking up in a pool of blood after allegedly having a miscarriage. Oddly, this testimony during cross-examination was the first time in the immigration process (which had begun three years and two asylum applications earlier) that Toure had ever mentioned the possibility that she was pregnant and had undergone a miscarriage during her captivity. We have found that "the addition of new factual assertions that were not originally set forth can be viewed as inconsistencies providing substantial evidence that the applicant is not a reliable or truthful witness." *Xiao v. Mukasey,* 547 F.3d 712, 717 (7th Cir. 2008) (citations and internal quotation marks omitted). In light of the evolution of Toure's assertions, there was substantial evidence supporting the IJ's finding that Toure was embellishing her original claim in an attempt to increase her chances at obtaining relief.

The IJ's denial of Toure's request for CAT protection was also appropriate. To obtain protection under CAT, one must show that "it is more likely than not that [one] would be tortured if removed to the proposed country of removal." *Rashiah v. Ashcroft,* 388 F.3d 1126, 1131 (7th Cir. 2004). "Torture" is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person" for purposes of obtaining a confession, punishment, intimidation, or "for any reason based on discrimination of any kind" when the pain is inflicted by or at the behest of a public official. 8 C.F.R. § 208.18(a)(1).

In support of her request for relief under CAT, Toure relies on her alleged past persecution, which the

IJ found was not supported by sufficient evidence. As such, Toure's CAT request lacks merit for the same reason her withholding of removal claim failed: she is unable to establish that she was persecuted for purposes of asylum, which requires less than what a party must show to establish a prima facie case for CAT protection. *Selimi v. Ashcroft*, 360 F.3d 736, 741 (7th Cir. 2004) ("To establish a prima facie case under CAT, [petitioners] must show that it is more likely than not that they would be tortured . . . . This also is a more stringent requirement than the requirements for asylum."). Toure's failure to meet her burden with respect to asylum means that she necessarily fails to meet her burden with respect to her request for CAT protection.

## B.   Ineffective Assistance of Counsel

We next turn to the BIA's denial of Toure's motion to reopen the proceedings based on ineffective assistance of counsel. Because the BIA has broad discretion in ruling on motions to reopen, we apply a "deferential, abuse-of-discretion standard of review." *Juarez*, 599 F.3d at 565. A motion to reopen proceedings "shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c)(1). To prevail on such a motion, Toure must show that her counsel was both ineffective and that Toure suffered prejudice as a result of her attorney's performance. *Surganova v. Holder*, 612 F.3d 901, 907 (7th Cir. 2010).

Aliens do not have a right to counsel under the Sixth Amendment. *Id.* And we have previously held that "no statute or constitutional provision entitles an alien who has been denied effective assistance of counsel in his . . . removal proceeding to reopen the proceeding on the basis of that denial." *Jezierski v. Mukasey*, 543 F.3d 886, 889 (7th Cir. 2008) (citations omitted). However, we have also recognized that the denial of effective assistance of counsel may under certain circumstances violate the due process guarantee of the Fifth Amendment. *Surganova*, 612 F.3d at 907; *see In re Lozada*, 19 I. & N. Dec. 637, 638 (BIA 1988) ("Ineffective assistance of counsel in a deportation proceeding is a denial of due process only if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case."). Toure asserts that Fortino-Brown was ineffective for failing to provide the court with the affidavit corroborating the date of her arrival (as well as a number of other alleged errors), and that these errors prejudiced Toure by depriving of her asylum claim altogether.

The BIA gave two reasons for its denial of Toure's motion to reopen: (1) that Toure failed to establish that the affidavit from Dia was previously unavailable; and (2) that Toure did not demonstrate that she had been prejudiced. We find that the BIA did not abuse its discretion in reaching either conclusion. As to the first finding, Toure's motion to reopen was properly denied because she made no showing that the affidavit from Dia was previously unavailable. Contrary to Toure's assertions on appeal, she was well aware of the

IJ's request for proof of her date of arrival. During the December 2004 hearing, the IJ stated on the record that she needed evidence of Toure's date of arrival, to which Branick (who spoke French and, according to Toure, translated for her) responded that they would provide affidavits substantiating Toure's date of arrival. At the January 2006 hearing, the IJ directly addressed Toure with the help of a professional French interpreter, saying, "You realize that there is an issue in your case. You're supposed to file for asylum within one year of your arrival, and we don't have proof of your date of entry." So, even if Toure did not understand the IJ's directive at the December 2004 hearing, the IJ made it abundantly clear at the January 2006 hearing that Toure needed to provide proof to substantiate her date of arrival.

Toure not only failed to provide the IJ with any such proof (or, for that matter, any justification for why she could not obtain this information), but Toure also waited to obtain the purportedly corroborating evidence until January 2008—two years after the 2006 hearing. Toure has never asserted that she had difficulty locating anyone who could corroborate her date of arrival. Indeed, Toure's brief states that her current attorney "obtained the affidavit quite easily," and Dia's affidavit avers that he "left [Toure] with my phone number in case she needed something." Therefore, the information contained in the affidavit was known by and available to Toure long before she filed the affidavit, and we find that the BIA's denial of the motion to reopen was well-grounded.

As the BIA determined, Toure failed to show that any alleged ineffective legal assistance prejudiced her. Toure contends that she was prejudiced by the IJ's adverse credibility finding, which the BIA affirmed based on its deferential standard of review for credibility questions. Toure's argument ignores that the IJ's credibility finding was based on the totality of her suspicions surrounding Toure's testimony and that none of the errors that Toure alleges her attorney made had any effect on that finding. Simply put, the IJ denied Toure relief because she did not believe her story. It is unlikely that the affidavit—which only affected the question of whether the application was time barred—would have changed the IJ's credibility finding. This is particularly true in light of the far-fetched nature of the affidavit's claims[3], which may have had the effect of bolstering the IJ's adverse credibility determination.

---

[3] In its entirety, the unedited text of Dia's affidavit reads:

> On Jun 13 of the year 2004 I picked Ndeye Fatou Toure a Congolese lady that needed help. She was seating in front of a mosque locate in Brooklyn Fulton street
>
> I advised her that in the state of Indiana it existed a community of Africans from Congo her country of origin and that she needed to try it since she did not have any relatives in NY. I also offered her ride to the greyhound bus terminal where I dropped her off.
>
> I left with my phone number in case she needed something.
>
> If you needed additional information please feel free to contact me at [redacted phone number].

More importantly, despite the IJ's credibility determination and finding that Toure's claim was time-barred, the IJ still considered Toure's application for asylum on the merits and found that denial of the application was appropriate because the alleged attacks did not rise to the level of persecution. As such, Toure cannot establish that she was prejudiced by her attorney's alleged mistakes because the IJ would have denied her claim on the merits even if the credibility and time barriers were not present. Based on the record, the BIA was entitled to find that Toure suffered no prejudice. *See Achacoso-Sanchez v. I.N.S.,* 779 F.2d 1260, 1266 (7th Cir. 1985) ("[T]he Board's reason need not be compelling, or even convincing, to be sufficient. The Board's decision is reasoned, and that is enough.").

## III. CONCLUSION

The petition for review is DENIED.