NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 25, 2011
Decided October 18, 2011

**Before**

MICHAEL S. KANNE, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*[*]

ANN CLAIRE WILLIAMS, *Circuit Judge*

| | |
|---|---|
| No. 09-4148 | Petition for Review of an Order of the Board of Immigration Appeals. |
| MOHAMED SAMASSA, *Petitioner*, | A078-674-512 |
| *v.* | |
| ERIC H. HOLDER, JR., Attorney General of the United States, *Respondent*. | |

### O R D E R

Mohamed Samassa, a national of Mauritania, petitions for review of an order upholding the denial of his application for asylum and related relief. We deny the petition.

---

[*] Circuit Judge Evans died on August 10, 2011, and did not participate in the decision of this case, which is being resolved by a quorum of the panel under 28 U.S.C. § 46(d).

Samassa entered the United States illegally in 2000 and applied for asylum, withholding of removal, and protection under the Convention Against Torture. As relevant here, he claimed that the Mauritanian government of President Maaouya Ould Sid'Ahmed Taya had persecuted him on the basis of his race or nationality. At a hearing before an Immigration Judge in March 2008, Samassa testified that he fell victim to the campaign of mass detention, forced labor, and expulsion that the Taya regime waged against tens of thousands of ethnic Afro-Mauritanians in the late 1980s and early 1990s. Historically, ethnic White Moors have controlled the Mauritanian government and economy, often to the detriment of Afro-Mauritanian groups like the Soninke tribe to which Samassa belongs (and to the disadvantage of another group called "Black Moors" or "Haratines").

In 1992, Samassa testified, soldiers entered his home, ripped up his family's identification documents, and accused the family of being noncitizens. They beat Samassa and his family, then trucked them to a prison with hot, crowded, and windowless cells that doubled as toilet areas. For two weeks, Samassa continued, he ate meager rations and was forced to make bricks in eleven-hour shifts. During this detention, soldiers beat him and other prisoners repeatedly, and he heard rumors that some prisoners died in detention. Eventually the soldiers expelled Samassa and his family across a river into neighboring Senegal, where his father died three months later from high blood pressure and injuries that Samassa attributed to the soldiers' actions. Senegal's government did not offer Samassa's family legal status.

The IJ supplemented the record with country reports more recent than those included with Samassa's application, and the Department of Homeland Security submitted further U.S. government reports without objection from Samassa's counsel. The new evidence suggested that much had changed in Mauritania. In 2005 President Taya was overthrown in a bloodless coup, and the State Department Report notes that in 2007 Sidi Mohamed Ould Cheikh Abdallahi was elected president in a relatively free and fair race. The new government, although apparently still dominated by Moors, had improved its relations with Afro-Mauritanians and repatriated thousands of expelled citizens.

Still, the picture painted by the reports was far from rosy. Economic, social, and political discrimination against Afro-Mauritanians persisted; Afro-Mauritanians remained under-represented in government; and those who had been repatriated had trouble getting new jobs or recovering the property they left behind. Returnees also reported that they did not receive identity documents and thus could not vote or safely travel.

At his hearing before the IJ, Samassa also presented letters from family members recounting stories of discrimination and gesturing toward other, vaguer fears. His mother and sister, who were apparently back in Mauritania, wrote that "the country does not change," and that his family dreaded famine and was unable to reacquire property

confiscated in the 1990s; further, many returnees were "disappointed." His sister also cautioned him against returning because "they will hurt you." Samassa testified without elaboration that his mother told him returnees had been "punished." When asked on cross-examination whether he knew what was happening in Mauritania today, he responded, "I don't know nothing other than what my mom write [sic] in the letter."

The IJ denied all forms of relief except voluntary departure. As relevant here, the IJ concluded that Samassa suffered past persecution on account of his race or nationality, but that the DHS had nevertheless rebutted the presumption of future persecution by demonstrating substantial changes in country conditions that negated the basis for his fear. Samassa appealed the IJ's decision to the Board of Immigration Appeals, which upheld the IJ's decision in a November 2009 order for substantially similar reasons. This petition for judicial review followed.

We pause here to acknowledge—as the parties' briefs do not—that by the time the Board issued its decision in November 2009, the elected government discussed in that decision had already been ousted in *another* coup in August 2008. *See* U.S. Dep't of State, Bureau of Democracy, Human Rights, and Labor, "2009 Human Rights Report: Mauritania" (Mar. 11, 2010), http://www.state.gov/g/drl/rls/hrrpt/2009/af/135965.htm. Then, in July 2009, still more than three months before the Board decided this case, the new junta held another election that was largely seen as free and fair. *Id.*; *but see* Freedom House, "Freedom in the World 2010 — Mauritania" (2010), http://www.freedomhouse.org/template.cfm?page=22&year=2010& country=7874 (questioning credibility of election observers).

Despite this political turmoil, recent reports show that Afro-Mauritanians still face circumstances similar to those reflected in the administrative record. Indeed, the 2009 State Department report characterizes the repatriation program as successful, recognizes that the new Mauritanian government has publicly acknowledged the Taya regime's role in persecution, and notes that the new government has begun compensating some victims. U.S. Dep't of State, "2009 Human Rights Report: Mauritania"; *see also* Freedom House, "Freedom in the World 2010 — Mauritania" ("The Aziz government continued Abdellahi's initiative to facilitate the return of some 30,000 black Mauritanians who had been expelled to Senegal and Mali following communal violence in 1989. They have received housing assistance, but many faced difficulty recovering confiscated land.") The 2010 report contains similar findings. With these developments in mind, we proceed to the merits.

Because the Board concluded that Samassa suffered race- or nationality-based persecution in the 1990s, the decisive issue is whether the DHS rebutted the presumption of future persecution that attaches when applicants demonstrate past persecution. *See* 8 C.F.R. §§ 208.13(b)(1), 1208.13(b)(1), 1208.16(b)(1); *Pathmakanthan v. Holder*, 612 F.3d 618, 624 (7th

Cir. 2010); *Ingmantoro v. Mukasey*, 550 F.3d 646, 649 (7th Cir. 2008). In making its rebuttal, the DHS had the burden to prove by a preponderance of the evidence that fundamental changes in Mauritania negated the basis for Samassa's fear. *See* 8 C.F.R. § 208.13(b)(1)(i)(A), (b)(1)(ii); *Xiao v. Mukasey*, 547 F.3d 712, 716 (7th Cir. 2008). The Board concluded that the DHS carried its burden; Samassa challenges that conclusion in his petition. To prevail in this court, Samassa would need to demonstrate that the record compels a conclusion contrary to the Board's. *See* 8 U.S.C. § 1252(b)(4); *INS v. Elias-Zacarias*, 502 U.S. 478, 483–84 (1992). Alternatively, he could obtain a remand for further proceedings if the Board overlooked "key aspects" of the claim he presented. *Kone v. Holder*, 620 F.3d 760, 763 (7th Cir. 2010) (quoting *Chen v. Holder*, 604 F.3d 324, 330 (7th Cir. 2010)).

Here, as in many other cases concerning the rebuttable presumption of future persecution, the Board relied on country-condition reports addressing the treatment of people situated similarly to the petitioner. *See Milanouic v. Holder*, 591 F.3d 566, 571 (7th Cir. 2010); *see also, e.g., Cheikh v. Holder*, 402 F. App'x 47, 52–53 (6th Cir. 2010) (nonprecedential decision) (collecting nonprecedential Sixth Circuit cases that discuss Mauritania's 2005 regime change); *Hamoudi v. Holder*, 377 F. App'x 556, 558 (7th Cir. 2010) (nonprecedential decision) (discussing 2005 regime change). While we have upheld the use of country reports to demonstrate changed conditions in some cases, we have repeatedly expressed our concern about "'the immigration service's chronic over reliance on such reports.'" *Koval v. Gonzales,* 418 F.3d 798, 807 (7th Cir. 2005) (citing *Niam v. Ashcroft*, 254 F.3d 652, 658 (7th Cir. 2004)); *see also Galina v. INS,* 213 F.3d 955, 959 (7th Cir. 2000). Rather than rely solely on generalized country reports, the IJ must conduct an "individual analysis that focuses on the specific harm suffered" by the petitioner. *Koval*, 418 F.3d at 807 (citing *Chand v. INS*, 222 F.3d 1066, 1079 (9th Cir. 2000)). Therefore, if country-condition reports are used to rebut the presumption of future persecution, they must address the particular basis for the petitioner's fear of persecution. *See Milanouic,* 591 F.3d at 571.

The country reports on which the IJ relied in this case meet this standard of specificity. At his hearing, Samassa claimed that he was persecuted because of his Afro-Mauritanian ethnicity and membership in the Soninke tribe. The country reports show that the notable elements of persecution suffered by Samassa and other Afro-Mauritanians in the 1990s—mass arrests, state-sponsored beatings and killings, and expulsion—no longer happen regularly in Mauritania. *See Ba v. Mukasey*, 539 F.3d 1265, 1269 (10th Cir. 2008); *see also Diop v. Holder*, 402 F. App'x 80 (6th Cir. 2010) (nonprecedential decision). Additionally, the IJ stated that one of the reports indicates that the government initiated repatriation for thousands of Afro-Mauritanians who were living as refugees in Senegal and Mali.

While the reports demonstrate progress and improved conditions specifically for Afro-Mauritanians, they also show, as the IJ acknowledged, that racial and ethic minorities still face discrimination. This generalized information, however, does not address how

Samassa in particular would be persecuted in Mauritania and it does not contradict the report's findings that the government is seeking to repatriate Afro-Mauritanians. Due to the reports' specific review of the status of Afro-Mauritanians in Mauritania, there was substantial evidence to support the IJ's determination that the country reports were sufficient to rebut the presumption of future persecution. However, "that does not mean that the country report is dispositive—it rebutted the presumption but did not ordain the outcome." *Milanouic*, 591 F.3d at 571–72. In other words, the petitioner may still rebut the *ipse dixit* assertions contained in the country reports by presenting contrary evidence. *See Koval*, 418 F.3d at 808; *see also Gailius v. INS*, 147 F. 3d 34, 45 (1st Cir. 1998) (stating that "asylum applicants are entitled to respond to claims of changed country conditions").

In *Milanouic*, we noted that evidence that local officials in Serbia who persecuted the petitioner were still present and that those opposing the ousted-Milosevic were still persecuted may have been sufficient to contradict the general country-condition reports about Serbia. *Milanouic*, 591 F.3d at 571. In *Koval*, we found that an IJ improperly excluded a witness who was a consultant to the United States on Ukrainian and Russian security issues and who may have contradicted a country report's finding that "generally there is not severe mistreatment or persecution" against people with non-native religions. *Koval*, 418 F.3d at 803.

The evidence Samassa presented as his hearing does not rise to the level we sought in *Milanouic* and *Koval* to contradict the particular findings of the country-condition reports. Samassa testified that "[t]hey will beat us," and that his mother sent him a letter that individuals who returned "got very punished." Samassa presented letters from family members at his hearing. The letter from Samassa's mother stated that "they will bother you more than the first time," and that people who have returned to Mauritania are "disappointed." His sister wrote that "nothing has changed" and warned that "they will hurt you." Samassa, however, also stated that "I don't know nothing" about what was going on presently in Mauritania "other than what my mom write me in the letter." It is unclear from the letters submitted into evidence, however, who the alleged persecutors are given the regime change, and Samassa did not present additional evidence that would otherwise contradict the country condition reports. Samassa argues in general terms that Mauritanian society is still rife with discrimination. Private discrimination without state acquiescence is not persecution, however, *Borovsky v. Holder*, 612 F.3d 917, 922 (7th Cir. 2010); *Ba*, 539 F.3d at 1270, so the legal question is whether the Mauritanian government directs or permits conduct targeted at Afro-Mauritanians that rises well above the level of "mere" harassment, unfair treatment, or dangerous practices, *Toure v. Holder*, 624 F.3d 422, 428 (7th Cir. 2010) (quoting *Nakibuka v. Gonzales*, 421 F.3d 473, 476 (7th Cir. 2005)); *Ba*, 539

F.3d at 1270; *see also Stanojkova v. Holder*, 645 F.3d 943, 948 (7th Cir. 2011). The answer, on this record, is no.[1]

Samassa also asserts in a single sentence that in the 1990s he "was economically persecuted by the military because the loss of the family farm resulted in a serious economic disadvantage, if not a total loss of livelihood, for Mr. Samassa." But he does not develop this point by elaborating on its implications for his claim of future persecution, or by addressing any cases discussing the thorny concept of economic persecution. Undeveloped contentions like this one are waived. *See Raghunathan v. Holder*, 604 F.3d 371, 378 (7th Cir. 2010); *Wang v. Gonzales*, 445 F.3d 993, 999 (7th Cir. 2006).

We should note that Samassa still may have been granted asylum, despite his failure to contradict the country reports. We have explained that even if the government overcomes the presumption, a petitioner may be entitled to asylum if his persecution was sufficiently heinous or his subjective fear of returning is objectively reasonable in light of credible evidence. *Capric v. Ashcroft*, 355 F.3d 1075, 1084 (7th Cir. 2004). Samassa has not presented evidence that would compel such a finding.

Finally, besides requesting asylum, Samassa applied for withholding of removal and relief under the CAT. Because he does not have a reasonable fear of future persecution, however, he does not meet the higher standard for withholding. *See Toure*, 624 F.3d at 428; *Torres v. Mukasey*, 551 F.3d 616, 625 (7th Cir. 2008). And because he does not discuss the CAT claim in his opening brief, Samassa has waived it. *See Haxhiu v. Mukasey*, 519 F.3d 685, 692 (7th Cir. 2008); *Huang v. Gonzales*, 403 F.3d 945, 951 (7th Cir. 2005).

Accordingly, we DENY the petition for review.

---

[1] With respect to the change in regime that occurred prior to the BIA's opinion in this case, we note that normally we may only consider "the administrative record on which the order of removal is based," 8 U.S.C. § 1252(b)(4)(A), and that the Board did not consider the subsequent country reports. Samassa does not allege error based on the BIA's failure to consider the change in regime prior to its decision, nor did he file a motion to remand before the BIA. To the extent Samassa wishes to address recent events, the proper course is to bring a motion to reopen before the Board on the basis of changed circumstances. 8 C.F.R. § 1003.2(c)(1), (3)(ii); *see also* 8 U.S.C. § 1229a(c)(7).